626 A.2d 445

THERESA LEHMANN, PLAINTIFF–APPELLANT AND CROSS–RE-SPONDENT, v. TOYS 'R' US, INC., A CORPORATION, DON BAYLOUS, AND JEFFREY WELLS, DEFENDANTS–RESPON-DENTS AND CROSS–APPELLANTS.

Argued February 1, 1993—Decided July 14, 1993.

*Fredric J. Gross* argued the cause for appellant and cross-respondent.

*James R. Williams,* a member of the New York bar, argued the cause for respondents and cross-appellants (*Greenberg, Dauber & Epstein,* attorneys; *Mr. Williams, Scott T. Baken,* a member of the New York bar, and *Ina B. Lewisohn,* of counsel).

*Alexander P. Waugh, Jr.,* Assistant Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Robert J. Del Tufo,* Attorney General, attorney; *Jeffrey C. Burstein,* Deputy Attorney General, on the brief).

*Nadine Taub* and *Michelle Joy Munsat* submitted a brief on behalf of *amici curiae* Women's Rights Litigation Clinic and NOW–NJ.

*Paul I. Weiner* submitted a brief on behalf of *amicus curiae* Employment Law Council (*Timins & Weiner,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal presents this Court with two questions concerning hostile work environment sexual harassment claims under the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5–1 to –42 (LAD). First, what are the standards for stating a cause of action for hostile work environment sex discrimination claims? Second, what is the scope of an employer's liability for a supervisor's sexual harassment that results in creating a hostile work environment? We hold that a plaintiff states a cause of action for hostile work environment sexual harassment when he or she alleges discriminatory conduct that a reasonable person of the same sex in the plaintiff's position would consider sufficiently severe or pervasive to alter the conditions of employment and to create an intimidating, hostile, or offensive working environment.

We further hold that in the determination of an employer's liability for damages when an employee raises a hostile work environment discrimination claim against a supervisor: (1) an employer will be strictly liable for equitable damages and relief; (2) an employer may be vicariously liable under agency principles for compensatory damages that exceed equitable relief; and (3) an employer will not be liable for punitive damages unless the harassment was authorized, participated in, or ratified by the employer.

## I.

### A. *Procedural History*

Plaintiff, Theresa Lehmann, brought a civil action in the Law Division against her former employer, Toys 'R' Us, Inc. (Toys 'R' Us); her former supervisor, Don Baylous; and Jeffrey Wells, a human resources manager at Toys 'R' Us. Plaintiff's principal allegations were that defendants subjected her to a hostile work environment on the basis of her sex in violation of the LAD. She asserted that sexual harassment perpetrated and condoned by the defendants had caused her to suffer damages including loss of wages and pension benefits, anxiety, detriment to her health, medical expenses, humiliation, and pain and suffering, and also that she had been required to expend attorneys' fees and to incur other litigation costs. She also alleged various other claims, separate from her LAD claims, including battery, negligence, intentional interference with contractual relations, and intentional infliction of emotional distress.

After a six-day bench trial, the trial court dismissed all of plaintiff's causes of action against defendants except her battery claim against Baylous, for which it awarded her $5,000 as damages.

Plaintiff's appeal to the Appellate Division resulted in the filing of three separate opinions. The Appellate Division unanimously affirmed the trial court's dismissal of plaintiff's non-LAD claims for invasion of privacy, intentional infliction of emotional distress, reprisal, and tortious interference with contractual relations. *Lehmann v. Toys 'R' Us*, 255 *N.J.Super.* 616, 605 *A.*2d 1125 (1992). The court also unanimously reversed the trial court's dismissal of plaintiff's hostile work environment sexual harassment claim and remanded the matter to the trial court for further fact-finding. Although the court agreed that the trial court had applied the wrong legal standards in evaluating plaintiff's LAD claim, it was unable to agree (splitting three ways) on the standards that should be

applied on remand to determine the sufficiency of Lehmann's hostile work environment claim and the standard that should be applied to determine Toys 'R' Us's liability for sexual harassment by its supervisor. Judge Shebell, writing for the majority, felt that a "more structured test is required at this juncture," 255 *N.J.Super.* at 642, 605 *A.*2d 1125. He therefore adopted, with significant modifications, the first four prongs of the test set forth in *Andrews v. City of Philadelphia*, 895 *F.*2d 1469 (3d Cir.1990). However, he rejected the *Andrews* court's use of *respondeat superior* principles to assess an employer's liability for hostile work environment sexual harassment by a supervisor, instead holding that an employer was strictly liable.

Judge D'Annunzio, in a brief separate concurrence, stated his "general agreement" with the majority's approach, but disagreed on the matter of an employer's vicarious liability for sexual harassment by a supervisory employee.

Judge Skillman, concurring in part and dissenting in part, rejected the *Andrews* test, and advocated instead that hostile work environment sexual harassment claims be evaluated under a more flexible standard based on the Equal Employment Opportunity Commission's *Guidelines on Discrimination Because of Sex*, 29 *C.F.R.* §§ 1604.1 to 1604.11 (EEOC Guidelines). Judge Skillman also stated that agency principles, rather than strict liability, ought to govern an employer's vicarious liability for sexual harassment by a supervisory employee.

In response to the conflicting opinions rendered by the Appellate Division, both parties filed appeals as of right pursuant to *Rule* 2:2-1(a), requesting this Court to identify the legal standards for stating an actionable claim of hostile work environment sexual harassment under the LAD and to define the standard for imposing liability on an employer for sexual harassment by its supervisor. Those are the only issues before this Court. We denied plaintiff's petition for certification, which addressed her non-LAD claims. 130 *N.J.* 19, 611 *A.*2d 657 (1992).

## B. *Facts*

The following facts were adduced at trial. Lehmann testified that she began working for Toys 'R' Us in August 1981 as a file clerk in the Purchasing Department. She received various promotions to supervisory positions.

In November 1985, defendant Don Baylous joined Toys 'R' Us as Director of Purchasing Administration. Baylous supervised approximately thirty people, including Lehmann, who held the position of Purchase Order Management Supervisor. Baylous and Lehmann worked closely together on a daily basis, and at least once a week Lehmann met with Baylous in his office. Lehmann received favorable evaluations and promotions under Baylous's supervision, and was promoted to Systems Analyst for the Purchasing Department in September of 1986.

In or around December 1986, plaintiff began to notice what she considered offensive sexual comments and touchings from Baylous directed at other female employees. Plaintiff witnessed Baylous walk up behind a female employee at the company Christmas party and put his hands on her. The female employee evidently found his touching offensive because she told him loudly and in angry terms to get his hands off her. The record is replete with other instances of Lehmann witnessing Baylous touch and grab other female employees, although the chronology of those events is somewhat unclear.

The first incident directly involving Lehmann occurred in January 1987. Lehmann testified that Baylous directed her to reject a 300–page purchase order and to tell the employee to rewrite it, and that she replied that the employee would be very angry. Lehmann testified that Baylous told her to "just lean over his desk and show him your tits, implying that that way Frank couldn't get upset at me." Lehmann testified that Baylous had, at various times, directed her to "stick your tits out at" a new boss, and to "write a memo to cover your ass * * * because you have such a cute little ass."

On another occasion in January 1987, Lehmann was in Baylous's office with him. She testified that

> Don stood up and walked around his desk and stood by the door. I rose and went to my right a little, and I noticed something out of the corner of my eye out of the window, and I said, what's going on out there? At this Don lifted the back of my shirt up over my shoulders. I know my bra strap was exposed, and said, give them a show. And I pulled my shirt down, ran out of the office crying, and I remember running to Marlene Pantess.

Ms. Pantess's testimony corroborated that Lehmann ran out of Baylous's office crying and that she stated that Baylous had lifted up her shirt.

Lehmann testified that on January 22, 1987, she went to Baylous's immediate boss, Bill Frankfort, to complain about Baylous's conduct. Lehmann requested that she not be identified to Baylous as the complainant. She stated that Frankfort told her to handle it herself, and that she replied that she did not feel she could do so because she had been too afraid to confront Baylous up to that point. Lehmann also testified that Frankfort told her not to report the harassment to Howard Moore, the Executive Vice President in charge of purchasing, because he "was very straight-laced, and he was a family man." Several days later, Lehmann wrote and delivered a letter to Frankfort concerning her complaints of sexual harassment, but Frankfort did not open the letter until after Lehmann's resignation.

On January 26, 1987, Eric Jonas, Toys 'R' Us's Manager of Employee Relations, called Lehmann and a female co-worker who also had had problems with Baylous to his office to discuss Baylous's conduct. Lehmann testified that she told Jonas of the specific incidents and gave him a list of names of other women who had experienced inappropriate touchings or comments from Baylous. Lehmann told Jonas that she did not want Baylous fired but wanted his inappropriate behavior stopped. Jonas assured her that he would speak to Baylous. Several days later, Frankfort told Lehmann that Baylous had been spoken to about his conduct.

However, according to Lehmann, Baylous's inappropriate conduct did not cease. In early February 1987, Lehmann was in Baylous's office and began to feel faint. She testified that she asked him to "just kick me into the hall" if she passed out, and that he replied that he would "take advantage of [her]" instead. She reported the incident to Jonas, who instructed her to keep a journal of such incidents. In the following weeks, Lehmann observed Baylous make a comment to a female employee about her anatomy. Lehmann's sister, also a Toys 'R' Us employee, told Lehmann that Baylous had come up behind her and rubbed her shoulders.

In early March 1987, Lehmann informed both Jonas and Frankfort that Baylous had not stopped touching employees and making inappropriate comments. She testified that Jonas told her that she was "paranoid." Jonas also offered Lehmann a transfer within the company, but Lehmann rejected that suggestion because, she said, she loved her job and had not done anything wrong and did not think she was the one who should be transferred.

The following week, Lehmann testified, Baylous grabbed her on the arm and she observed him touching and grabbing other female employees as well. She also was present at a meeting at which Baylous gratuitously announced that the reason that both he and another female employee had colds was not due to sexual intimacy.

Dissatisfied with the results of Jonas's and Frankfort's efforts to control Baylous's conduct, Lehmann took her complaints to Howard Moore, the Executive Vice President in charge of purchasing, on April 6. Lehmann told him that she felt she was being forced out of the company. Moore was dismayed that such conduct was going on without his knowledge.

Later that same day, Lehmann was called to personnel to meet with Laurie Lambert. Lehmann related to Lambert all that had occurred. Lambert offered Lehmann a transfer, but

Lehmann again protested "why should I have to transfer when I worked so hard for this job that I love after six years of being in this company?"

The next day, Lehmann gave Baylous two weeks notice of her resignation, stating that it was for personal reasons. She was again summoned to meet with Lambert. Lambert again offered Lehmann a transfer, and recommended that Lehmann confront Baylous directly with her allegations to clear the air. Lehmann rejected both suggestions.

Lehmann testified that a few minutes later, Baylous entered the room. She related to him her complaints. She testified that he was apologetic at first, but that he grew angry and she became increasingly upset. Following the confrontation, Lehmann left Toys 'R' Us and did not return to complete her final two-week period.

Baylous denies that he ever engaged in sexually harassing conduct. He admits that he was formerly a "touchy" person, using pats on the back to convey approval and tapping people to get their attention. However, he denies that he ever touched any employee in a sexual manner, and vigorously denies the "sweater-lifting incident." He also admits to having made some suggestive comments, such as asking one employee if she had gone home for a "quickie" and telling another employee that she had a "cute rump," but he maintained that those comments were intended and interpreted as jokes. He denied ever telling Lehmann to "stick out" or "show" her "tits" or telling her that she had "a cute ass."

Jeffrey Wells, Toys 'R' Us's head of personnel, testified that he had made inquiries and discovered that there had been no window washing undertaken on the building in January 1987. That evidence was offered to refute Lehmann's statement that she saw scaffolding outside Baylous's window at the time of the shirt-lifting incident. Wells also testified that the company had continued investigating the allegations after Lehmann's departure, and that it had concluded that Baylous had not

engaged in sexual harassment. Wells's conclusions about Baylous's conduct were consistent with Baylous's testimony about himself.

Eric Jonas testified that he had monitored Baylous's conduct by making unannounced visits to Baylous's department. He also stated that he had interviewed four of the women whom Lehmann had identified as able to corroborate her complaints, and that none could do so.

Lehmann contended that Toys 'R' Us's investigation was inadequate. She asserted that despite the fact that Toys 'R' Us has a written corporate policy against sexual harassment requiring all claims to be fully investigated, the investigation documented, and those responsible subject to discipline or discharge, Jonas did not keep any substantive written records and failed to question key witnesses about important events. The trial court agreed.

> [T]his court wishes to note that it was unimpressed with Toys R Us' investigation of plaintiff's complaints. It appears from the testimony that the Toys R Us' employees in charge of investigating this matter did not properly and thoroughly attend to plaintiff's allegations, thus exacerbating plaintiff's problems.

Although Lehmann and defendants disagree about whether Baylous engaged in sexually harassing conduct, all agree and stipulated that Baylous did not attempt to obtain any sexual advantage from any employee of Toys 'R' Us.

The trial court, for the most part, declined to resolve the factual dispute between the parties. Instead, it assumed that all of Lehmann's allegations were true and held that nonetheless she had failed to state a claim for hostile work environment sexual harassment. The Appellate Division unanimously agreed that a hostile work environment in violation of LAD would be established if plaintiff's factual allegations were credited by a finder of fact. We affirm the Appellate Division's judgment that the trial court's dismissal of plaintiff's LAD claims must be reversed and the matter remanded for further fact-finding.

## II. *Sexual Harassment and The*
## *Law Against Discrimination*

The New Jersey Law Against Discrimination was first enacted in 1945. Its purpose is "nothing less than the eradication 'of the cancer of discrimination.'" *Fuchilla v. Layman*, 109 *N.J.* 319, 334, 537 *A.*2d 652 (quoting *Jackson v. Concord Co.*, 54 *N.J.* 113, 124, 253 *A.*2d 793 (1969), *cert. denied sub nom. University of Medicine & Dentistry of N.J. v. Fuchilla*, 488 *U.S.* 826, 109 *S.Ct.* 75, 102 *L.Ed.*2d 51 (1988). The opportunity to obtain employment "is recognized as and declared to be a civil right." *N.J.S.A.* 10:5–4.

The LAD was enacted to protect not only the civil rights of individual aggrieved employees but also to protect the public's strong interest in a discrimination-free workplace. *Fuchilla, supra,* 109 *N.J.* at 335, 537 *A.*2d 652. Freedom from discrimination is one of the fundamental principles of our society. Discrimination based on gender is "peculiarly repugnant in a society which prides itself on judging each individual by his or her merits." *Grigoletti v. Ortho Pharmaceutical Corp.*, 118 *N.J.* 89, 96, 570 *A.*2d 903 (1990) (citation omitted).

The LAD specifically prohibits employment discrimination based on sex. *N.J.S.A.* 10:5–12 provides:

> It shall be unlawful employment practice, or, as the case may be, an unlawful discrimination:
>
> a. For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, sex * * * of any individual, * * * to refuse to hire or employ or to bar or to discharge * * * from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment * * *.

The legislative history of the LAD is silent on the subject of sexual harassment.

In construing the terms of the LAD, this Court has frequently looked to federal precedent governing Title VII of the Civil Rights Act of 1964, 42 *U.S.C.A.* § 2000e to § 2000e–17 ("Title VII"), as "a key source of interpretive authority." *Grigoletti, supra,* 118 *N.J.* at 97, 570 *A.*2d 903. Although the "substantive

and procedural standards that we have developed under the State's LAD have been markedly influenced by the federal experience," *ibid.*, we have "applied the Title VII standards with flexibility" and "have not hesitated to depart" from federal precedent "if a rigid application of its standards is inappropriate under the circumstances." *Id.* at 107, 570 *A.*2d 903.

Sexual harassment is a form of sex discrimination that violates both Title VII and the LAD. *See Meritor Sav. Bank v. Vinson,* 477 *U.S.* 57, 106 *S.Ct.* 2399, 91 *L.Ed.*2d 49 (1986) (holding that when supervisor sexually harasses a subordinate because of subordinate's sex, that supervisor discriminates on basis of sex in violation of Title VII); *Erickson v. Marsh & McLennan Co.,* 117 *N.J.* 539, 555–56, 569 *A.*2d 793 (1990) (suggesting that sexual harassment that creates hostile environment is prohibited under LAD).

Sexual harassment jurisprudence generally divides sexual harassment cases into two categories. Quid pro quo sexual harassment occurs when an employer attempts to make an employee's submission to sexual demands a condition of his or her employment. It involves an implicit or explicit threat that if the employee does not accede to the sexual demands, he or she will lose his or her job, receive unfavorable performance reviews, be passed over for promotions, or suffer other adverse employment consequences. Hostile work environment sexual harassment, by contrast, occurs when an employer or fellow employees harass an employee because of his or her sex to the point at which the working environment becomes hostile.

Plaintiff Lehmann does not charge that defendant Baylous engaged in quid pro quo sexual harassment. Rather, she alleges that his sexually-charged offensive conduct towards her and other women in the workplace created a hostile work environment.

Quid pro quo sexual harassment is more easily recognized and more clearly defined and well-established as a cause of action. Hostile work environment sexual harassment, on the

other hand, has only recently been recognized as actionable sexual harassment. Because of the relatively recent recognition of the harm, some confusion remains in the minds of employers and employees concerning what sorts of conduct constitute hostile work environment sexual harassment.

In the majority of hostile work environment cases, the harassing conduct takes the form of unwelcome sexual touchings and comments. However, the harassing conduct need not be sexual in nature; rather, its defining characteristic is that the harassment occurs because of the victim's sex. *See Muench v. Township of Haddon,* 255 *N.J.Super.* 288, 605 *A.*2d 242 (App.Div.1992) (holding defendant employer liable for hostile work environment sexual harassment where employees harassed dispatcher because she was female although harassment was not sexual in nature).

Although we recognized in *Erickson, supra,* 117 *N.J.* at 155–57, 569 *A.*2d 793, that allegations of a sexually hostile work environment state a claim under the LAD, we have not yet been called on to define the elements of a hostile work environment sexual harassment cause of action. In fashioning a standard we acknowledge that the hostile work environment claim is still evolving. Conduct considered normal and non-discriminatory twenty years ago may well be considered discriminatory today.

Like all courts, we are reluctant to penalize behavior that was not previously understood or intended to be wrongful. However, we cannot deny legal redress to the victims of discrimination and harassment merely because the perpetrators may be unaware of the illegality of their conduct. In order to ensure fairness for all, both employees and employers must be able to understand what constitutes a claim for gender-hostile work environment. A clear and intelligible legal standard will protect employees from the damage wrought by a hostile working environment and will enable employers to conform their conduct to the law.

We therefore agree with the majority below that a structured definition of the cause of action is preferable at this early stage in the development of the law concerning hostile work environment sexual harassment. However, we are sensitive to the concern expressed by Judge Skillman in his dissent below that the standard must be "sufficiently flexible to recognize the wide variety of forms which hostile work environment sexual discrimination may take and to allow for the evolution of this new area of law." 255 *N.J.Super.* at 648, 605 *A.2d* 1125.

We find that the standards expressed in the EEOC Guidelines, while helpful, are insufficiently structured to define the cause of action at this stage in the development of the law. However, we agree with the dissent below that the Third Circuit's *Andrews* test employed by the majority below contains too many analytical difficulties and deficiencies to be usefully employed here.

Rather than risking confusion by engrafting major revisions to the *Andrews* test, we announce a new test in the hope of creating a standard that both employees and employers will be able to understand and one that employers can realistically enforce. We cannot overstate the importance we place on a test that allows employees to know their rights in a given set of circumstances and that allows employers to set policies and procedures that comply with that test.

To state a claim for hostile work environment sexual harassment, a female plaintiff must allege conduct that occurred because of her sex and that a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive working environment. For the purposes of establishing and examining a cause of action, the test can be broken down into four prongs: the complained-of conduct (1) would not have occurred *but for* the employee's gender; and it was (2) *severe or pervasive* enough to make a (3) *reasonable woman* believe that (4) the conditions of employment are altered and the

*working environment is hostile or abusive.* However, the second, third, and fourth prongs, while separable to some extent, are interdependent. One cannot inquire whether the alleged conduct was "severe or pervasive" without knowing *how* severe or pervasive it must be. The answer to that question lies in the other prongs: the conduct must be severe or pervasive enough to make a reasonable woman believe that the conditions of employment are altered and her working environment is hostile.

In this case, we discuss the standard assuming a female plaintiff, because in both the present case and the majority of cases, the plaintiff is a woman. However, the standard we announce today applies to sexual harassment of women by men, men by women, men by men, and women by women. The LAD protects both men and women and bars both heterosexual and homosexual harassment. The only difference in the standard would be that a male plaintiff would have to allege conduct that a reasonable *man* would believe altered the conditions of his employment and created a working environment that was hostile to men.

### III. *Harassment Because of Plaintiff's Sex*

The first element of the test is discrete from the others. It simply requires that in order to state a claim under the LAD, a plaintiff show by a preponderance of the evidence that she suffered discrimination because of her sex. Common sense dictates that there is no LAD violation if the same conduct would have occurred regardless of the plaintiff's sex. For example, if a supervisor is equally crude and vulgar to all employees, regardless of their sex, no basis exists for a sex harassment claim. Although the supervisor may not be a nice person, he is not abusing a plaintiff because of her sex.

The LAD is not a fault- or intent-based statute. A plaintiff need not show that the employer intentionally discriminated or harassed her, or intended to create a hostile work environment. The purpose of the LAD is to eradicate discrimi-

nation, whether intentional or unintentional. Although unintentional discrimination is perhaps less morally blameworthy than intentional discrimination, it is not necessarily less harmful in its effects, and it is at the *effects* of discrimination that the LAD is aimed. Therefore, the perpetrator's intent is simply not an element of the cause of action. Plaintiff need show only that the harassment would not have occurred but for her sex.

When the harassing conduct is sexual or sexist in nature, the but-for element will automatically be satisfied. Thus when a plaintiff alleges that she has been subjected to sexual touchings or comments, or where she has been subjected to harassing comments about the lesser abilities, capacities, or the "proper role" of members of her sex, she has established that the harassment occurred because of her sex.

However, not all sexual harassment is sex-based on its face. In *Andrews, supra,* 895 *F.*2d 1469, for example, the plaintiff female police officers alleged, among other things, that male officers hostile to women on the force stole their case files and vandalized their personal property. When the form of the harassment is not obviously based on the victim's sex, the victim must make a prima facie showing that the harassment occurred because of her sex. *See also Muench, supra,* 255 *N.J.Super.* 288, 605 *A.*2d 242 (holding that woman police dispatcher was subject to non-sexual harassment that constituted sexual discrimination under LAD).

In such non-facially sex-based harassment cases a plaintiff might show that such harassment was accompanied by harassment that was obviously sex-based. Alternatively, she might show that only women suffered the non-facially sex-based harassment. All that is required is a showing that it is more likely than not that the harassment occurred because of the plaintiff's sex. For a female plaintiff, that will be sufficient to invoke the rebuttable presumption that the harassment did in fact occur because of the plaintiff's sex. A male plaintiff, in order to invoke the presumption, must make the additional

showing that the defendant employer is the rare employer who discriminates against the historically-privileged group. *Erickson, supra,* 117 *N.J.* at 551, 569 *A.*2d 793 ("In reverse discrimination cases, the rationale supporting the rebuttable presumption of discrimination embodied in the prima facie elements does not apply. Thus, when a complainant is not a member of a minority, courts have generally * * * require[d] the plaintiff to show that he has been victimized by an unusual employer who discriminates against the majority." (citation omitted)).

■ In the case at bar, of course, the harassing conduct alleged by Lehmann consisted of sexual comments and touchings. Such allegations satisfy the requirement that the plaintiff show that the conduct occurred because of her sex.

#### IV. *"Severe or Pervasive"*

■ We turn next to the requirement that the alleged harassing conduct be "severe or pervasive." We emphasize that it is the *harassing conduct* that must be severe or pervasive, not its effect on the plaintiff or on the work environment. *Ellison v. Brady,* 924 *F.*2d 872, 878 (9th Cir.1991).

The disjunctive "severe or pervasive" standard is in conformity with federal Title VII law. The United States Supreme Court in *Meritor* held that "for sexual harassment to be actionable, it must be sufficiently *severe or pervasive*" to cause the requisite harm. 477 *U.S.* at 67, 106 *S.Ct.* at 2405, 91 *L.Ed.*2d at 60 (emphasis added). We specifically reject the "regular and pervasive" standard created in *Andrews, supra,* 895 *F.*2d 1469, and adopted by the majority below. First, that formulation is incompatible with the "severe or pervasive" standard set forth by the Supreme Court in *Meritor.* Second, a "regular and pervasive" standard would bar actions based on a single, extremely severe incident or, perhaps, even those based on multiple but randomly-occurring incidents of harassment. We find that result improper. Although it will be a rare and extreme case in which a single incident will be so severe that it would,

from the perspective of a reasonable woman, make the working environment hostile, such a case is certainly possible. The LAD was designed to prevent the harm of hostile working environments. No purpose is served by allowing that harm to go unremedied merely because it was brought about by a single, severe incident of harassment rather than by multiple incidents of harassment.

The fact patterns of many reported cases suggest, however, that most plaintiffs claiming hostile work environment sexual harassment allege numerous incidents that, if considered individually, would be insufficiently severe to state a claim, but considered together are sufficiently pervasive to make the work environment intimidating or hostile. "[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Ellison, supra,* 924 *F.*2d at 878.

Rather than considering each incident in isolation, courts must consider the cumulative effect of the various incidents, bearing in mind " 'that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes.' " *Burns v. McGregor Elec. Indus.,* 955 *F.*2d 559, 564 (8th Cir.1992) (quoting *Robinson v. Jacksonville Shipyards,* 760 *F.Supp.* 1486, 1524 (M.D.Fla.1991)). "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents but on the overall scenario." *Andrews, supra,* 895 *F.*2d at 1484.

### V. *The Requisite Level of Harm*

We next consider the level of harm a plaintiff must show to state a valid hostile work environment LAD claim. This is a subject on which there has been considerable disagreement among the federal courts. The United States Supreme Court has granted certiorari to resolve the split among the

federal circuits on this question. *See Harris v. Forklift Sys.*, — *U.S.* ——, 113 *S.Ct.* 1382, 122 *L.Ed.*2d 758 (1993).

On one side of the split are those circuits that hold that in order to state a claim of hostile work environment sexual harassment, the plaintiff must allege conduct that "had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive work environment that affected seriously the psycho logical [sic] well-being of the plaintiff * * *." *Rabidue v. Osceola Refining Co.*, 805 *F.*2d 611 (6th Cir.1986), *cert. denied*, 481 *U.S.* 1041, 107 *S.Ct.* 1983, 95 *L.Ed.*2d 823 (1987); *accord Wilson v. Zapata Off–Shore Co.*, 939 *F.*2d 260 (5th Cir.1991); *Brooms v. Regal Tube Co.*, 881 *F.*2d 412 (7th Cir.1989); *Paroline v. Unisys Corp.*, 879 *F.*2d 100 (4th Cir.1989), *aff'd in relevant part, rev'd in part*, 900 *F.*2d 27 (1990); *Sparks v. Pilot Freight Carriers*, 830 *F.*2d 1554 (11th Cir.1987).

The courts on the other side of the split hold that a plaintiff must show that the complained-of conduct was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ellison, supra*, 924 *F.*2d at 876; *accord Meritor, supra*, 477 *U.S.* at 67, 106 *S.Ct.* at 2405, 91 *L.Ed.*2d at 60 ("for sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment" (citations omitted)); *Kotcher v. Rosa & Sullivan Appliance Ctr.*, 957 *F.*2d 59 (2d Cir.1992); *Andrews, supra*, 895 *F.*2d 1469; *Lipsett v. University of Puerto Rico*, 864 *F.*2d 881 (1st Cir.1988); *Minteer v. Auger*, 844 *F.*2d 569 (8th Cir.1988); *Vinson v. Taylor*, 753 *F.*2d 141 (D.C.Cir.1985).

We find the latter line of cases more consistent with the purposes of the LAD. Although psychological damage to victims of harassment is one of the harms the LAD seeks to prevent, it is by no means the only one. The Legislature has found that because of illegal discrimination, of which sexual

harassment is a form, "people suffer personal hardships, and the State suffers a grievous harm." *N.J.S.A.* 10:5–3. Among the personal hardships noted by the Legislature are

economic loss; time loss; physical and emotional stress; and in some cases severe emotional trauma, illness, homelessness or other irreparable harm resulting from the strain of employment controversies; relocation, search and moving difficulties; anxiety caused by lack of information, uncertainty, and resultant planning difficulty; career, education, family and social disruption; and adjustment problems * * *.

[*Ibid.*]

Sex discrimination and sexual harassment also cause serious economic harms. Dr. Freada Klein, a researcher and consultant to large companies on sexual harassment, has estimated that the cost of sexual harassment for a typical Fortune 500 service or manufacturing company of 23,784 employees is over $6.7 million per year, *exclusive* of costs of litigation, processing state or federal charges, and destructive behavior or sabotage. The $6.7 million figure derives from the costs of employee turnover, absenteeism, reduced productivity, and the use of internal complaint mechanisms. *The Civil Rights Act of 1991: Hearings on H.R. 1 Before the House Committee on Education and Labor,* 102nd Cong., 1st Sess. 168, 207–214 (1991) (statement of Dr. Freada Klein) (hereinafter Klein). That harm to the productivity and profitability of corporations necessarily harms the economy of the State and the welfare of its citizens.

Moreover, the Legislature has declared that discrimination is "a matter of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State." *N.J.S.A.* 10:5–3.

Given the breadth of individual and societal harms that flow from discrimination and harassment, to limit the LAD's application to only those cases in which the victim suffered, or could have suffered, serious psychological harm would be contrary to its remedial purpose. We find no support in the statute for

engrafting a requirement of serious psychological harm before a plaintiff can state a claim. It is the harasser's conduct, not the plaintiff's injury, that must be severe or pervasive. We agree with the *Ellison* court that "[s]urely, employees need not endure sexual harassment until their psychological well-being is seriously affected to the extent that they suffer anxiety or debilitation" before they can bring a claim. 924 *F*.2d at 878; *see also Carrero v. New York City Hous. Auth.*, 890 *F*.2d 569, 578 (2d Cir.1989) ("a female employee need not subject herself to an extended period of demeaning and degrading provocation before being entitled to seek the remedies provided under Title VII").

Of course, if a plaintiff suffers psychological harm and wishes to collect damages for that injury, she must show that she suffered psychological harm and to what extent. However, that proof goes to the amount of her damages, not to whether she states a cause of action.

Nor need a plaintiff show that she suffered an economic loss. The plaintiff's injury need be no more tangible or serious than that the conditions of employment have been altered and the work environment has become abusive. Although the LAD provides for compensatory and punitive damages, it is not primarily a tort scheme; rather, its primary purpose is to end discrimination. Because discrimination itself *is* the harm that the LAD seeks to eradicate, additional harms need not be shown in order to state a claim under the LAD. In a claim of hostile work environment sexual harassment, the hostile work environment *is* the legally recognized harm. Therefore, a plaintiff in a hostile work environment sexual harassment case establishes the requisite harm if she shows that her working conditions were affected by the harassment to the point at which a reasonable woman would consider the working environment hostile.

In making that showing, the plaintiff may use evidence that other women in the workplace were sexually harassed.

The plaintiff's work environment is affected not only by conduct directed at herself but also by the treatment of others. A woman's perception that her work environment is hostile to women will obviously be reinforced if she witnesses the harassment of other female workers. Therefore, we hold that the plaintiff need not personally have been the target of each or any instance of offensive or harassing conduct. Evidence of sexual harassment directed at other women is relevant to both the character of the work environment and its effects on the complainant.

> The few courts that have addressed this issue have generally concluded that incidents involving employees other than the plaintiff are relevant in establishing a generally hostile work environment. In *Vinson,* the District of Columbia Court of Appeals concluded that the trial court's rejection of evidence of harassment of female employees other than the plaintiff was improper. "Evidence tending to show Taylor's harassment of other women working alongside Vinson is directly relevant to the question whether he created an environment violative of Title VII." [*Vinson v. Taylor, supra,* 753 *F.*2d] at 146. The court held that no evidence of sexual harassment directed specifically toward the plaintiff was necessary for a claim under Title VII: "Even a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere where such harassment was pervasive." *Id.* at 146. This view finds support in racial discrimination cases brought under Title VII. *See Rogers v. Equal Employment Opportunity Comm'n,* 454 *F.*2d 234 (5th Cir.1971), *cert. denied,* 406 *U.S.* 957, 92 *S.Ct.* 2058, 32 *L.Ed.*2d 343 (1972).

[*Hicks v. Gates Rubber Company,* 833
*F.*2d 1406, 1416 (10th Cir.1987).]

*Accord Hall v. Gus Constr.,* 842 *F.*2d 1010, 1015 (8th Cir.1988) ("Although [the plaintiff] was not subjected to sexual propositions and offensive touching, evidence of sexual harassment directed at employees other than the plaintiff is relevant to show a hostile work environment.").

### VI. *The Reasonable Woman Standard*

In evaluating whether the harassment alleged was sufficiently severe or pervasive to alter the conditions of employment and to create a hostile or intimidating work environment for a female plaintiff, the finder of fact shall consider the question

from the perspective of a reasonable woman. If the plaintiff is male, the perspective used shall be that of a reasonable man. We choose an objective and gender-specific perspective for a number of reasons.

We choose an objective standard, first, because as we explained above, the LAD is not primarily a tort scheme but rather is aimed at eradicating discriminatory conduct. An objective reasonableness standard better focuses the court's attention on the nature and legality of the conduct rather than on the reaction of the individual plaintiff, which is more relevant to damages.

Secondly, an objective standard provides flexibility. As we noted above, much conduct that would have been considered acceptable twenty or thirty years ago would be considered sexual harassment today. As community standards evolve, the standard of what a reasonable woman would consider harassment will also evolve.

However, incorporating community standards through the use of a reasonableness standard brings dangers against which courts must guard. We emphasize that the LAD is *remedial* legislation. Its very purpose is to change existing standards of conduct. Thus, the reasonableness requirement must not be used to hold that the prevailing level of discrimination is *per se* reasonable, or that a reasonable woman would expect sexual harassment on entering a historically male-dominated workplace. The LAD is designed to remediate conditions of hostility and discrimination, not to preserve and immunize pre-existing hostile work environments.

Thirdly, we choose an objective rather than a subjective viewpoint because the purpose of the LAD is to eliminate *real* discrimination and harassment. "It would not serve the goals of gender equality to credit a perspective that was pretextual or wholly idiosyncratic." Kathryn Abrams, *Gender Discrimination and the Transformation of Workplace Norms,* 42 *Vand. L.Rev.* 1183, 1210 (1989). A hypersensitive employee might

have an idiosyncratic response to conduct that is not, objectively viewed, harassing. Allegations of such non-harassing conduct do not state a claim, even if the idiosyncratic plaintiff perceives her workplace to be hostile, because the complained-of conduct, objectively viewed, is not harassment, and the workplace, objectively viewed, is not hostile.

Conversely, an extraordinarily tough and resilient plaintiff might face harassing conduct that was, objectively viewed, sufficiently severe or pervasive to make the working environment hostile or intimidating, but because of her toughness, she might not personally find the workplace hostile or intimidating. Under our objective standard, such a plaintiff would state a claim even if she personally did not experience the workplace as hostile or intimidating. Sexual harassment is illegal even if the victim is strong enough not to be injured. Because such tough employees are perhaps the most likely to be strong enough to challenge harassers, the remedial purposes of the LAD are furthered by permitting claims by emotionally resilient plaintiffs without regard to subjective injury.

Of course, the subjective reaction of the plaintiff and her individual injuries remain relevant to compensatory damages. However, a plaintiff's subjective response is not an element of a hostile work environment sexual harassment cause of action.

We emphasize that only claims based on the idiosyncratic response of a hypersensitive plaintiff to conduct that is not objectively harassing would be barred by the reasonable woman standard. The category of reasonable women is diverse and includes both sensitive and tough people. A woman is not unreasonable merely because she falls toward the more sensitive side of the broad spectrum of reasonableness. Nor should "reasonable" be read as the opposite of "emotional." Perhaps because "reasonable" contains the word "reason," some have interpreted reasonableness as requiring a Vulcan-like rationality and absence of feeling. The reasonable woman standard should not be used to reject as unreasonable an emotional

response to sexual harassment. On the contrary, such a response is normal and common. Only an idiosyncratic response of a hypersensitive plaintiff to conduct that a reasonable woman would not find harassing is excluded by the reasonable woman standard.

We turn now to our reasons for choosing a gender-specific standard. We believe that in order to fairly evaluate claims of sexual harassment, courts and finders of fact must recognize and respect the difference between male and female perspectives on sexual harassment. The reasonable person standard glosses over that difference, which is important here, and it also has a tendency to be male-biased, due to the tendency of courts and our society in general to view the male perspective as the objective or normative one.

Although there is far from a uniform female perspective on sexual harassment, nonetheless, the research and literature on sexual harassment suggest that there are differences in the way sexual conduct on the job is perceived by men and women. Kathryn Abrams argues that men consider sexual comments and conduct as "comparatively harmless amusement." Abrams, *supra*, 42 *Vand.L.Rev.* at 1203 (citing Barbara Gutek, *Sex and the Workplace* 47–54 (1985)). When sexual comments or conduct are directed at them, men are apt to find it harmless and perhaps even flattering, but they are unlikely to consider it insulting or intimidating. *Id.* at 1206. Women, on the other hand, are more likely to find sexual conduct and comments in the workplace offensive and intimidating. *Ibid.* Abrams is speaking here only about heterosexual sexual harassment; she notes that "[t]hese conclusions might be different if a man were harassed by a gay male employer or supervisor." *Id.* at 1206 n. 97. Indeed, our general observation of a current social debate suggests to us that many men find the prospect of sexual harassment by other men extremely insulting and intimidating and not at all a "comparatively harmless amusement."

Two societal realities may underlie the difference in male and female perspectives. First, women live in a world in which the possibility of sexual violence is ever-present. Given that background, women may find sexual conduct in an inappropriate setting threatening. As the *Ellison* court perceptively wrote,

because women are disproportionately victims of rape and sexual assault, women have a stronger incentive to be concerned with sexual behavior. Women who are victims of mild forms of sexual harassment may understandably worry whether a harasser's conduct is merely a prelude to violent sexual assault. Men, who are rarely victims of sexual assault, may view sexual conduct in a vacuum without a full appreciation of the social setting or the underlying threat of violence that a woman may perceive.

[924 *F.*2d at 879.]

Second, in many areas of the workforce, women still represent a minority and are relatively recent entrants into the field. Because of their predominantly junior and minority status, for some women it is more difficult than it is for men to win credibility and respect from employers, coworkers, and clients or customers. That can make women's position in the workplace marginal or precarious from the start. Sexual harassment operates to further discredit the female employee by treating her as a sexual object rather than as a credible coworker. That can both undermine the woman's self-confidence and interfere with her ability to be perceived by others as a capable worker with the potential to advance and succeed. Abrams, *supra*, 42 *Vand.L.Rev.* at 1208–09. Because of women's different status in the workplace, conduct that may be "just a joke" for men may have far more serious implications for women.

Those and other differences between the experiences of men and women shape the different perspectives of men and women. Finders of fact applying the gender-specific reasonableness standard must understand and respect those different perspectives.

## VII. *Employer Liability*

If a plaintiff establishes that she was sexually harassed by her supervisor, then the question remains whether the employ-

er is vicariously liable for the supervisor's harassment. This case is the first to present the question of employer liability for sexual harassment since the LAD was amended in 1990 to provide that "all remedies available in common law tort actions shall be available to prevailing plaintiffs" in Superior Court actions. *N.J.S.A.* 10:5–13 (as amended by *L.*1990, *c.* 12). Prior to those amendments, although some compensatory relief (including damages for emotional distress resulting from discrimination) was available under the LAD, *see, e.g., Jackson, supra,* 54 *N.J.* at 125–28, 253 *A.*2d 793; *Gray v. Serruto Builders,* 110 *N.J.Super.* 297, 317, 265 *A.*2d 404 (Ch.Div.1970), the primary form of relief available was equitable in nature. *See Shaner v. Horizon Bancorp,* 116 *N.J.* 433, 436–37, 561 *A.*2d 1130 (1989).

Today, therefore, we must decide what standards to apply to assess employer liability not only for equitable remedies but also for compensatory damages and punitive damages. The Appellate Division unanimously agreed that employers should be strictly liable for all equitable damages and relief arising from hostile work environment claims, and that an employer should not be automatically liable for punitive damages resulting from hostile work environment sexual harassment by a supervisor. However, the Appellate Division was unable to agree on the employer's liability for compensatory damages in a supervisory hostile work environment claim. One judge would impose strict liability on an employer for such compensatory damages, 255 *N.J.Super.* at 641, 605 *A.*2d 1125, while the others would apply principles of general agency law to determine the scope of an employer's liability in hostile work environment cases, *id.* at 644, 660, 605 *A.*2d 1125.

When the LAD dealt primarily with equitable relief, there was little need to address the issue of employer liability for wrongful conduct of a supervisor. The LAD's remedial purpose of eliminating discrimination and harassment in the workplace was served by holding the employer directly respon-

sible, without regard to fault, for restoring an aggrieved employee to the terms, conditions, and privileges of employment the employee would have enjoyed but for the workplace discrimination or harassment. For the remedial purpose of the LAD to be fulfilled, the employer must take action, because generally the employer is the party with the power and responsibility to hire, promote, reinstate, provide back pay, and take other remedial action. Likewise, only the employer can impose prospective measures to prevent future discrimination and harassment in the workplace. For those reasons, both the courts and the Director of the Division on Civil Rights have imposed liability for equitable relief directly on employers. We see no reason to alter that sound policy. Therefore, we reaffirm that in cases of supervisory sexual harassment, whether the harassment is of the quid pro quo or the hostile work environment type, the employer is directly and strictly liable for all equitable damages and relief. Equitable damages may include hiring or reinstating the harassment victim, disciplining, transferring, or firing the harasser, providing back pay and/or front pay, and taking preventative and remedial measures at the workplace. This list is not intended to be exclusive.

However, different considerations apply to determine the proper standards of employer liability for compensatory and punitive damages. Unlike the situation with equitable damages, the employer is not necessarily the only one capable of providing compensatory relief and is not necessarily the party whose conduct is sufficiently outrageous to warrant punitive damages. Moreover, the Legislature, in amending the LAD to allow "all remedies available in common law tort actions," implied that "common law rules of liability, including general principles of agency law" should apply. *Lehmann v. Toys 'R' Us, supra,* 255 *N.J.Super.* at 660, 605 *A.*2d 1125 (Skillman, J.A.D., dissenting). Using agency law to govern employer liability for compensatory damages is also consistent with the United States Supreme Court's directive that agency principles be applied in Title VII cases.

In *Meritor Savings Bank v. Vinson, supra,* a majority of the Supreme Court rejected the rule of automatic strict liability for supervisory sexual harassment in hostile work environment cases. Although the majority declined "to issue a definitive rule on employer liability," it suggested that "Congress wanted courts to look to agency principles for guidance in this area." 477 *U.S.* at 72, 106 *S.Ct.* at 2408, 91 *L.Ed.*2d at 63. The majority wrote:

> While such common-law principles may not be transferable in all their particulars to Title VII, Congress' decision to define "employer" to include any "agent" of an employer surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible. For this reason, we hold that the Court of Appeals erred in concluding that employers are always automatically liable for sexual harassment by their supervisors. See generally Restatement (Second) of Agency §§ 219–237 (1958).

[*Ibid.*]

The majority did not expand on how agency principles would be applied to sexual harassment cases. However, later lower court cases have interpreted *Meritor* as holding that employer liability is governed by strict liability in quid pro quo cases and by agency principles in hostile work environment cases.

Justice Marshall wrote a separate concurring opinion in *Meritor,* in which Justices Brennan, Blackmun, and Stevens joined. The minority would have adopted the strict liability standard. 477 *U.S.* at 74, 106 *S.Ct.* at 2409, 91 *L.Ed.*2d at 64 (citing 29 *C.F.R.* § 1604.11(c) (emphasis added)). The concurrence rejected the distinction between quid pro quo and hostile work environment cases urged by the Solicitor General. The minority found that position "untenable," explaining that

> [a] supervisor's responsibilities do not begin and end with the power to hire, fire, and discipline employees, or with the power to recommend such actions. Rather, a supervisor is charged with the day-to-day supervision of the work environment and with ensuring a safe, productive workplace. There is no reason why abuse of the latter authority should have different consequences than abuse of the former. In both cases it is the authority vested in the supervisor by the employer that enables him to commit the wrong: it is precisely because the supervisor is understood to be clothed with the employer's authority that he is able to impose unwelcome sexual conduct on subordinates.

[*Id.* at 76–77, 106 *S.Ct.* at 2410, 91 *L.Ed.*2d
at 65–66 (Marshall, J., concurring).]

Justice Stevens also joined in the majority opinion. He wrote a separate concurrence, which stated in its entirety: "Because I do not see any inconsistency between the two opinions, and because I believe the question of statutory construction that Justice Marshall has answered is fairly presented by the record, I join both the Court's opinion and Justice Marshall's opinion." *Id.* at 73, 106 *S.Ct.* at 2409, 91 *L.Ed.*2d at 64.

 We agree with Justice Stevens that there is no inherent contradiction between the majority's adoption of agency principles and Justice Marshall's observation that a supervisor's delegated authority often goes beyond the power to hire and fire. We are satisfied that agency principles are sufficiently well-established to provide employers with notice of their potential liability and also sufficiently flexible to provide just results in the great variety of factual circumstances presented by sexual harassment cases and to accomplish the purposes of the LAD. Accordingly, we hold that employer liability for supervisory hostile work environment sexual harassment shall be governed by agency principles.

Section 219 of the *Restatement (Second) of Agency* outlines the liability of a master for the torts of a servant.

(1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.

(2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:

(a) the master intended the conduct or the consequences, or

(b) the master was negligent or reckless, or

(c) the conduct violated a non-delegable duty of the master, or

(d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

 Applying those principles, we declare that under § 219(1) an employer whose supervisory employee is acting within the scope of his or her employment will be liable for the supervisor's conduct in creating a hostile work environment. Moreover, even in the more common situation in which the

supervisor is acting outside the scope of his or her employment, the employer will be liable in most cases for the supervisor's behavior under the exceptions set forth in § 219(2). For example, if an employer delegates the authority to control the work environment to a supervisor and that supervisor abuses that delegated authority, then vicarious liability under § 219(2)(d) will follow. *See* Katherine S. Anderson, Note, *Employer Liability Under Title VII for Sexual Harassment After Meritor Savings Bank v. Vinson,* 87 *Colum.L.Rev.* 1258, 1274 (1987) (suggesting vicarious liability may follow from agency principles when supervisor acts as "employer's surrogate in the day-to-day management of his subordinates"); *see also* Note, *Sexual Harassment Claims of Abusive Work Environment Under Title VII,* 97 *Harv.L.Rev.* 1449, 1461 (1984) (arguing that where employer gives supervisor the power to "structur[e] the work environment—setting a tone and disciplining offenders," employer is vicariously liable for supervisor's abuse of that authority to create hostile work environment).

The determination of whether a supervisor who creates a hostile work environment was aided in accomplishing that tort by the power delegated to him or her to control the day-to-day working environment requires a detailed fact-specific analysis. Specifically, the finder of fact must decide:

1. Did the employer delegate the authority to the supervisor to control the situation of which the plaintiff complains * * * ?

2. Did the supervisor exercise that authority?

3. Did the exercise of authority result in a violation of [the LAD]?

4. Did the authority delegated by the employer to the supervisor aid the supervisor in injuring the plaintiff?

[Bruce Chandler Smith, *When Should an Employer Be Held Liable For The Sexual Harassment by a Supervisor Who Creates a Hostile Work Environment? A Proposed Theory of Liability,* 19 *Ariz.St.L.J.* 285, 321 (1987).]

When the answer to each of those questions is yes, then the employer is vicariously liable for the supervisor's harassment under § 219(2)(d).

Another basis for employer liability under agency law is negligence, as set forth in § 219(2)(b). While we decline to set forth a standard of negligence governing sexual harassment claims, we note that common sense suggests that sexual harassment at the workplace is foreseeable, even where anti-harassment policies exist. Although estimates of the incidence of sexual harassment in the workplace vary, all estimates indicate that the problem is widespread. Estimates include: 53% of women having experienced sexual harassment at some point, Abrams, *supra,* 42 *Vand.L.Rev.* at 1197–98; 50% of women and 15% of men, *Lipsett, supra,* 864 *F.*2d at 898; 42% of women and 15% of men employed by the federal government, U.S. Merit Systems Protection Board, *Sexual Harassment in the Federal Workplace: Is It a Problem?* 3 (1981); 15% of women and 5% of men *each year, The Civil Rights Act of 1991: Hearings on H.R. 1 Before the House Committee on Education and Labor,* 102nd Cong., 1st Sess. 168 (1991) (statement of Dr. Freada Klein).

In light of the known prevalence of sexual harassment, a plaintiff may show that an employer was negligent by its failure to have in place well-publicized and enforced anti-harassment policies, effective formal and informal complaint structures, training, and/or monitoring mechanisms. We do not hold that the absence of such mechanisms automatically constitutes negligence, nor that the presence of such mechanisms demonstrates the absence of negligence. However, the existence of effective preventative mechanisms provides some evidence of due care on the part of the employer.

> Employers that effectively and sincerely put five elements into place are successful at surfacing sexual harassment complaints early, before they escalate. The five elements are: policies, complaint structures, and that includes both formal and informal structures; training, which has to be mandatory for supervisors and managers and needs to be offered for all members of the organization; some effective sensing or monitoring mechanisms, to find out if the policies and complaint structures are trusted; and then, finally, an unequivocal commitment from the top that is not just in words but backed up by consistent practice."

[Klein, *supra,* at 171.]

Similarly, given the foreseeability that sexual harassment may occur, the absence of effective preventative mechanisms will present strong evidence of an employer's negligence.

Employer liability through agency law may also be found under § 219(2)(a) if the employer intended the conduct. If a plaintiff can show that an employer had actual knowledge of the harassment and did not promptly and effectively act to stop it, liability under that section may be appropriate. However, such conduct would also more clearly qualify as negligence or recklessness, thus triggering liability under § 219(2)(b).

Federal courts have used agency principles to hold employers liable for the acts of their supervisors, even when the acts are outside the scope of employment, in a number of circumstances. In many cases, the courts appear to find vicarious liability using a negligence rubric. Those cases speak of the employer's constructive knowledge and its absence of effective grievance procedures. *See EEOC v. Hacienda Hotel,* 881 *F.*2d 1504, 1516 (9th Cir.1989) (holding employer liable and imputing constructive knowledge to employer because if reasonable care exercised, employer should have known about harassment); *Yates v. Avco Corp.,* 819 *F.*2d 630, 636 (6th Cir.1987) (finding that harassment was foreseeable and that management should have known about it on reasonably diligent inquiry); *Robinson, supra,* 760 *F.Supp.* at 1531 (imputing constructive knowledge to employer because acts of harassment were "too pervasive to have escaped the notice of reasonably alert management").

Other Title VII cases suggest that the basis for finding vicarious liability through agency law was intent, under § 219(2)(b), or, more probably, apparent authority, under § 219(2)(d). In those cases, the harassed employees reasonably believed that the harassment was tolerated by upper management. *See Yates, supra,* 819 *F.*2d at 635–36 (vicarious liability where employees had substantiated belief that grievance procedure was ineffective and harasser's conduct tolerated by man-

agement). The EEOC's *Policy Guidance on Current Issues of Sexual Harassment,* 8 *Lab.Rel.Rep.* (BNA) ¶ 405.6682 (1990), would apply the *Restatement* § 219(2)(d) to those situations in which there was an inadequate harassment policy, or a policy was improperly enforced.

> If the employer has not provided an effective avenue to complain, then the supervisor has unchecked, final control over the victim and it is reasonable to impute his abuse of this power to the employer. The Commission generally will find an employer liable for "hostile environment" sexual harassment by a supervisor when the employer failed to establish an explicit policy against sexual harassment and did not have a reasonably available avenue by which victims of sexual harassment could complain to someone with authority to investigate and remedy the problem.

Both of those situations could give rise to a reasonable inference that the supervisor's harassing conduct was tacitly approved by upper management, thus triggering liability under § 219(2)(d).

Although an employer's liability for sexual harassment of which the employer knew or should have known can be seen to flow from agency law, it also can be understood as direct liability. When an employer knows or should know of the harassment and fails to take effective measures to stop it, the employer has joined with the harasser in making the working environment hostile. The employer, by failing to take action, sends the harassed employee the message that the harassment is acceptable and that the management supports the harasser. *See* Anderson, *supra,* 87 *Colum.L.Rev.* at 1274–75. "Effective" remedial measures are those reasonably calculated to end the harassment. The "reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment." *Ellison, supra,* 924 *F.*2d at 882.

We recognize that although we have declined to hold employers strictly liable for hostile work environment sexual harassment by supervisors, we have created a standard that may often result in employers being held vicariously liable for such harassment. We note that there is an important difference between strict liability and vicarious liability under agency law.

Under a strict liability standard, an employer would *always* be liable for supervisory hostile work environment sexual harassment, regardless of the specific facts of the case. We think that in some cases strict liability would be unjust—for example, "where a supervisor rapes one of his subordinates in the workplace." *Lehmann v. Toys 'R' Us, supra,* 255 *N.J.Super.* at 661, 605 *A.*2d 1125 (Skillman, J.A.D., dissenting).

Under agency law, an employer's liability for a supervisor's sexual harassment will depend on the facts of the case. An employer will be found vicariously liable if the supervisor acted within the scope of his or her employment. Moreover, even if the supervisor acted outside the scope of his or her employment, the employer will be vicariously liable if the employer contributed to the harm through its negligence, intent, or apparent authorization of the harassing conduct, or if the supervisor was aided in the commission of the harassment by the agency relationship. Thus, an employer can be held liable for compensatory damages stemming from a supervisor's creation of a hostile work environment if the employer grants the supervisor the authority to control the working environment and the supervisor abuses that authority to create a hostile work environment. An employer may also be held vicariously liable for compensatory damages for supervisory sexual harassment that occurs outside the scope of the supervisor's authority, if the employer had actual or constructive notice of the harassment, or even if the employer did not have actual or constructive notice, if the employer negligently or recklessly failed to have an explicit policy that bans sexual harassment and that provides an effective procedure for the prompt investigation and remediation of such claims.

Concerning punitive damages, we agree with the Appellate Division that a greater threshold than mere negligence should be applied to measure employer liability. Punitive damages are to be awarded "when the wrongdoer's conduct is especially egregious." *Leimgruber v. Claridge Assocs.,* 73

*N.J.* 450, 454, 375 *A.*2d 652 (1977). Hence, the employer should be liable for punitive damages only in the event of actual participation by upper management or willful indifference. *Shrout v. Black Clawson Co.*, 689 *F.Supp.* 774 (S.D.Ohio 1988) (finding that under Ohio law, employer can be liable for punitive damages for sexual harassment by supervisor where employer ratified, participated in, or acquiesced in wrongdoing); *Security Aluminum Window Mfg. v. Lehmann Assocs.*, 108 *N.J.Super.* 137, 146, 260 *A.*2d 248 (App.Div.1970); *Winkler v. Hartford Accident and Indem. Co.*, 66 *N.J.Super.* 22, 29, 168 *A.*2d 418 (App.Div.) (holding that "[e]xemplary damages may not be recovered against an employer for the wrongful act of an employee, unless the act was specifically authorized, participated in, or ratified by the master"), *certif. denied*, 34 *N.J.* 581, 170 *A.*2d 544 (1961); *Kay v. Peter Motor Co.*, 483 *N.W.*2d 481, 485 (Minn.App.1992) (holding punitive damages appropriate only when employer's "willful indifference" to misconduct proven).

Essentially, we view the issue of the scope of an employer's liability for compensatory and punitive damages as a question of public policy. Arguments abound on both sides of the issue. We view the crucial issue to be which position provides the most effective intervention and prevention of employment discrimination. The Attorney General, representing the New Jersey Division on Civil Rights, recommends that general agency principles of common law be applied. The Division on Civil Rights, as the agency that enforces the LAD, is entitled to great deference, especially when its position is supported by the statutory language and is consistent with the history of the LAD and in conformity with the United States Supreme Court and most courts that have discussed this issue.

Courtrooms are not the best place to prevent or remedy a hostile work environment.

Litigation is vastly disruptive of the plaintiffs' relations with others in the workplace. Such disruption occurs even in areas of employment discrimination in which plaintiffs' allegations are less emotionally charged than in the context

of sexual harassment. The sexual harassment plaintiff typically is subjected to further or intensified harassment as she pursues her claim, and her relationships with both men and women in the workplace may be severed beyond repair, a form of damage that even legal victory cannot undo. Moreover, changes in behavior that are compelled by judicial decree, rather than voluntarily introduced and advocated by the employer, may produce lingering resentment among male workers that affects not only their receptivity to subsequent female coworkers, but also their behavior toward the other women in their lives. Strategies to end sexual harassment should not require all women to make the difficult choice between enduring continued harassment and seeking costly victory in the courts.

Litigation can also be a comparatively blunt tool for producing changes in workplace norms. Judgments—and even opinions—in sexual harassment cases give employers only an anecdotal notion of what behavior is unacceptable, and otherwise fail to direct employers toward more satisfactory behavior. Nor do these decisions, in and of themselves, organize or educate employees to produce the necessary changes in conduct. An adverse judgment also may put supervisors on the defensive, rather than engaging them as participants in bringing about change. For the protection of women and the education of those who victimize them, it is necessary to explore less coercive means of normative change.

[Abrams, *supra*, 42 *Vand.L.Rev.* at 1183 (footnotes omitted).]

The most important tool in the prevention of sexual harassment is the education of both employees and employers. Consensus among employees and employers should be the goal. We think that providing employers with the incentive not only to provide voluntary compliance programs but also to insist on the effective enforcement of their programs will do much to ensure that hostile work environment discrimination claims disappear from the workplace and the courts.

To summarize, in determining an employer's liability for compensatory and punitive damages when an employee raises a hostile work environment discrimination claim against a supervisor, a three-part standard should be employed. First, strict liability should apply for relief that is equitable in nature. Second, agency principles, which include negligence, should be applied to decide if an employer is liable for compensatory damages that exceed that equitable relief. Third, a higher level of culpability than mere negligence should be required for punitive damages. The issue of Toys 'R' Us's liability should

not have been dismissed on a summary judgment motion. On remand, its liability must be reassessed.

### VIII. *Conclusion*

The judgment of the Appellate Division is affirmed as modified. The matter is remanded for findings of fact and further proceedings consistent with this opinion.

*For modification, affirmance and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, O'HERN, GARIBALDI and STEIN—5.

*Opposed*—None.