**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3227-17T3

CORAL MASON,

    Plaintiff-Appellant,

v.

SAKER SHOPRITES, INC.,
ROSE SCRIPKO, and NICK MOY,

    Defendants-Respondents.

_____

Argued March 13, 2019 – Decided July 8, 2020

Before Judges Fuentes, Accurso and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-2539-16.

Richard Armen Mc Omber and Elizabeth A. Matecki argued the cause for appellant (McOmber & McOmber, PC, attorneys; Richard Armen Mc Omber, Christian V. Mc Omber, Matthew Allen Luber, and Elizabeth A. Matecki, of counsel and on the briefs).

Ari G. Burd argued the cause for respondents (Giordano Halleran & Ciesla, PC, attorneys; Jay S. Becker, of counsel; Ari G. Burd, of counsel and on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

In August 2015, Saker ShopRites, Inc. (Shoprite) hired plaintiff Coral Mason to work as a food service clerk. Plaintiff received an employee handbook that contained and described Shoprite's sexual harassment policy. Plaintiff also signed an acknowledgment form confirming that she had read the employee handbook and agreed to comply with the policies listed therein. Plaintiff resigned from her position four months after she was hired.

On April 25, 2016, plaintiff filed a two-count complaint predicated on alleged violations of the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, against ShopRite; Rose Scripko, the store's food service manager; and Nick Moy, the manager of human resources. Count one alleged a hostile work environment caused by pervasive sexual harassment; Count two asserted retaliation and constructive discharge. Seven weeks before the discovery end date, plaintiff moved to amend her complaint to include a third count alleging retaliation under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14.

The judge assigned to manage the case denied plaintiff's motion to amend the complaint in an order dated July 7, 2017. The judge also denied plaintiff's

motion for reconsideration in an order dated August 18, 2017. The court scheduled the case for trial on March 19, 2018. Defendants moved for summary judgment fifty-one days before the scheduled trial date. The judge heard argument on defendants' motion on February 16, 2018 and entered an order granting summary judgment on February 20, 2018.

In this appeal, plaintiff argues the motion judge: (1) erred in denying her motion to amend her complaint to include a CEPA cause of action, and (2) misapplied the standard codified in Rule 4:46-2(c) when he granted defendants' motion and dismissed plaintiff's complaint with prejudice. We reject these arguments and affirm.

I

Plaintiff was thirty-four years old when she began working at ShopRite in August 2015. She immigrated from Turkey in 2010 and is a graduate of Istanbul University with a degree in journalism. At her deposition taken in September 2017, plaintiff testified she sought employment at ShopRite on the internet and specifically applied for a position "in the departments [for] food service, bakery, fish, [and] seafood." She testified that she was interviewed by defendant Nick Moy. At her deposition, plaintiff acknowledged she received a copy of the "ShopRite Associate Handbook" (Handbook) on July 25, 2015, and that Moy

told her he was available if she had any questions about the policies contained therein. The appellate record also includes plaintiff's signed acknowledgement attesting to having received a copy of the Handbook.

The Handbook detailed ShopRite's personnel policies, including a policy on sexual harassment, which stated:

> Each supervisor has an affirmative duty to maintain his/her workplace free of sexual harassment. This duty includes discussing this policy with all Associates and assuring them that they are not permitted to engage in and are not required to endure exploitative sexual treatment. Similarly, every Associate has an affirmative duty to comply with [ShopRite's] policy. Specifically, no person shall threaten or insinuate, either explicitly or implicitly, that an Associate's refusal to submit to sexual advances will adversely affect the Associate's employment, evaluation, wages, advancement, assigned duties, shifts, work environment, or any other condition of employment or career development.
>
> Any Associate who believes that he/she has been the subject of harassment should report the alleged act immediately to the Store Manager and/or the Human Resources Department for investigation. All actions taken to resolve complaints of harassment through internal investigation shall be conducted confidentially. After appropriate investigation, any Associate who has engaged in harassment will be subject to disciplinary action up to and including discharge.

Plaintiff's duties included stocking the hot food bar with premade food in the morning, ensuring the hot food bar was stocked during the day, and cleaning

4

it up in the evening; this involved throwing the leftover food in the store's compost bin. Plaintiff viewed defendant Rose Scripko as her supervisor, a perception reinforced by ShopRite's description of Scripko's duties in response to one of plaintiff's interrogatories dated October 28, 2016:

> Ms. Scripko currently holds the position of Clerk also known as a food service manager for the Hazlet Saker location. Ms. Scripko is a member of a union and as such, lacks authority to discipline employees, such as Ms. Mason. She has held this position since 2011.

In the course of her deposition, plaintiff identified three men whom she believed were the store's managers: "Mr. Wheeler, Mr. Frank, and there was another man, but I don't remember his name." Plaintiff also testified that she "got along" with defendant Scripko at first, but it changed when: "I complained to her about some issues that were going on and then her behavior towards me changed." Defense counsel asked plaintiff to explain:

> Q. What . . . did you complain to [Scripko] about?
>
> A. I complained about theft going on in the store by some co-workers. And I complained about food service people, you know, theft, I mean taking the food and cooking -- which was ShopRite's -- ShopRite's...
>
> Q. Property?
>
> A. Property, using it and cooking it behind the counter and serving it to people that worked in the store for free.

5

So I complained, I told her and she disregarded it. She just kept -- just she did nothing basically.

Defense counsel also asked plaintiff to identify the incidents of sexual harassment she experienced. According to plaintiff, she complained to Scripko "about Solomon Adeyefa and other male workers that were pressuring me, making me feel like a piece of meat every time I went in the morning, every time I got in . . . that store. So I complained about that, too." Plaintiff identified Adeyefa as a food service clerk. She provided the following description of Adeyefa's alleged lascivious comments and behavior:

> One afternoon, I came to my shift and I think he was about to leave, and we were supposed to put [on] hair nets, we were supposed to put our hair in a hair net, and I came in and I was putting my hair in a net and out of nowhere he came to me and asks me if I just had sex before I came to work, and I was not expecting that. I don't even talk [about] this type of subjects with my friends even, and let alone in a working environment. And I was shocked. And he said that and he left. And that's what happened.

Plaintiff testified there were three other coworkers present when Adeyefa allegedly made these comments to her. She identified them as "Charlie, Nancy . . . and I think Tomina." According to plaintiff, up to this incident, her relationship with Adeyefa had been "professional." Plaintiff claimed she was so "shocked" by Adeyefa's uncharacteristic behavior and "felt so bad" that she did

6

not say anything to him before he left. When she regained her composure, she spoke with "Charlie who is one of the chefs working there and he told me to go to manager, go to management." However, Nancy Canzoneri, a coworker whom plaintiff viewed as "higher up to me," suggested that she confront Adeyefa directly and tell him she was offended by his remark.

Plaintiff testified that she followed Canzoneri's suggestion and confronted Adeyefa the following day. In response to defense counsel's question at her deposition, plaintiff provided the account of Adeyefa's reaction:

> I told him that I didn't like the way he talked to me and he thanked me for not going to the management. That's all.
>
> Q. Did he -- well, did he apologize to you?
>
> A. No. He said he's not going to do it again and he thanked me for not going to the management.

According to plaintiff, Adeyefa did not keep his promise. Plaintiff alleged she overheard Adeyefa tell a male coworker "I would hit that" about a woman who worked in the salad bar. Plaintiff told the female coworker about Adeyefa's remark. According to plaintiff, the woman at the salad bar seemed unconcerned about Adeyefa's remark. She told plaintiff: "he's like that, he says these things and they went through that with him."

A-3227-17T3

Defense counsel also read to plaintiff the following two allegations of sexual harassment she made in her complaint to ascertain with greater specificity what actually occurred:

> "Plaintiff took food out to the compost in the back of the store. When plaintiff returned, she mentioned that her hands were dirty. A male employee stated loudly and in a sexual manner to other co-workers, 'Oh, she likes it dirty.'" Can you tell me who . . . the employees are that are being referenced here, if you recall?
>
> A. I don't remember their names.
>
>     . . . .
>
> Q. Can you tell me anything more about this? For example, were there other people there when this happened?
>
> A. There were other workers. I don't know their name. They were not food service workers.

Defense counsel read the second alleged incident of sexual harassment aloud to plaintiff:

> Q. Just again, I'm going to read aloud from the complaint. "During another shift, a male employee was bringing gloves into the food service area and stated to plaintiff, 'I need extra[-]large gloves.' A male coworker responded in a lewd manner, 'Oh, you're telling the ladies you're extra[-]large.'" Again, I'm just trying to get more information about this.
>
> A. Okay.

Q. Do you recall who these employees are who are referenced here?

A. Yes.

Q. And who are they?

A. It was Mr. Frank who . . . he's the one who usually brings the supplies, like gloves, paper towels and stuff like that. So it was Frank, Mr. Frank, he brought -- who brought gloves, box of gloves, and he asked Tyrell Matthews. And I was -- I was there. It was him, Tyrell and me in the same area where I could hear, and he said, "What size gloves do you want." And Tyrell said he wants extra[-]large gloves. And Mr. Frank said, and he's the store manager, he said, "Oh, are you telling the ladies that you're extra[-]large."

Q. This was a conversation between Mr. Frank and Mr. Tyrell?

A. Yes.

Q. Okay. And you . . . how did you overhear this?

A. Because they were loud, they -- I can't say it was a conversation because he was, Oh, are you telling the ladies, he was loud. I was there so I could hear it.

A. Yes.

Q. -- them back and forth? Okay.

A. It was not a conversation like we are having right now.

A-3227-17T3

Plaintiff also alleged that she witnessed "Angelo the maintenance man" touch Nancy Canzoneri, a person whom plaintiff considered to be her immediate supervisor, in an inappropriate manner. Specifically, plaintiff alleged Angelo touched Canzoneri on her "butt," causing Canzoneri to say: "stop touching my butt." Plaintiff also testified in her deposition that Canzoneri "wasn't . . . bothered by it. She . . . didn't seem annoyed because it was like a -- kind of like giggle." This prompted defense counsel to ask plaintiff the following question:

> Q. So why did this stand out to you? What about this did you have a problem with or did you think was wrong?
>
> A. I thought it was wrong. It wasn't professional. And it didn't seem right to me, that this was happening after I complained about sexual harassment, this kind of behavior and speech will be tolerated between the workers, and Nancy, who was higher up from me, would tolerate that. And it was obvious to me that that's why they weren't really be careful about it.

Plaintiff also complained about seeing a woman employee lift up a piece of raw chicken and yell to other women coworkers that it looked like female genitalia. Plaintiff condemned this behavior as "unprofessional jokes, comments, sexually-inappropriate comments." Plaintiff described the final allegation of sexual harassment by a male coworker as follows:

> There were many sexual comments which made me just feel like a piece of meat every time I went to the store.

10

And at one time again I was taking the compost out and I asked for help from one of the male workers and he said to me -- I asked something and he said, "You can ask anything with that accent, it's so sexy." That's what he said.

Q. Do you recall who that was?

A. I know . . . I remember his face, I don't know his name.

Plaintiff resigned from her job at ShopRite in December 2015.

II

We start our analysis by addressing the judge's decision to deny plaintiff's motion to amend her complaint to include a CEPA cause of action. Defendants filed their responsive pleading on June 3, 2016, and the case was assigned a "Track III" designation for discovery purposes. See R. 4:5A-1. This gave the parties 450 days of discovery and established a discovery end date of August 27, 2017. The judge assigned to manage this litigation extended the discovery end date to December 17, 2017. Nearly a year after joinder of issue, plaintiff moved to amend her complaint to add a third count for retaliation under CEPA. Plaintiff's counsel submitted a certification in support of the motion in which she stated that when plaintiff was deposed by defendants' counsel on May 25, 2017, she

11

testified that she witnessed illegal and/or unlawful conduct by employees of . . . ShopRite. Specifically, [p]laintiff testified that she witnessed employees of . . . ShopRite stealing food and smoking marijuana during their work shifts.

4. At her deposition, [p]laintiff further testified that she complained and/or protested against such illegal and/or unlawful conduct. Additionally, [p]laintiff testified that following her complaints of such illegal and/or unlawful conduct, [p]laintiff was subjected to retaliation and ultimately constructively terminated as a result of same.

The judge provided the following explanation in support of his decision:

Plaintiff is seeking to add CEPA claims which were not included when this complaint was filed on April 25, 2016, although all facts were known to plaintiff at the time and the discovery end date is seven weeks away. Further, plaintiff argues that although the facts were obviously known to her, that they were neither "significant nor clear" at the time of filing, but offers no basis for the lack of clarity. Lastly, plaintiff asserts that "new fact witnesses were identified" during her own deposition, which are neither identified nor is there an explanation of how this occurred.

Rule 4:9-1 codifies the relevant standard to amend a pleading:

A party may amend any pleading as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is to be served, and the action has not been placed upon the trial calendar, at any time within 90 days after it is served. Thereafter a party may amend a pleading only by written consent of the adverse party or by leave of court which shall be freely given in the interest of

12

justice. A motion for leave to amend shall have annexed thereto a copy of the proposed amended pleading. A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 20 days after service of the amended pleading, whichever period is longer, unless the court otherwise orders.

[(Emphasis added).]

"[T]he granting of a motion to file an amended complaint always rests in the court's sound discretion." Kernan v. One Washington Park Urban Renewal Assocs., 154 N.J. 437, 457 (1998). Indeed, our Supreme Court has made clear that motions seeking to amend a complaint are to be "granted liberally." Id. at 456. However, a court's discretion under this rule is subject to limits. Notte v. Merchs. Mut. Ins. Co., 185 N.J. 490, 501 (2006).

In Notte, the Court explained that a trial court's ruling under Rule 4:9-1 must satisfy a two-step process. Ibid. First, the trial court must determine "whether the non-moving party will be prejudiced" by the amended complaint. Ibid. When plaintiff's proposed amendment to the original complaint is based on the same underlying facts set forth in the original pleading, a defendant is not prejudiced. Ibid. However, a party can be prejudiced when the amended complaint results in "undue delay." Tomaszewski v. McKeon Ford, 240 N.J. Super. 404, 411 (App. Div. 1990). If the non-moving party will not be

13

prejudiced, the court must inquire as to "whether granting the amendment would nonetheless be futile." Notte, 185 N.J. at 501. An amended claim is futile when it cannot be sustained as a matter of law. Ibid.

Here, the motion judge did not apply the two-step process required by Notte in his statement of reasons for denying plaintiff's motion. The judge also failed to apply Notte when he decided to deny plaintiff's motion for reconsideration. The order simply stated: "[T]he motion for reconsideration is denied." The judge nevertheless noted that when plaintiff's counsel filed the original complaint, all the facts that were necessary to assert a CEPA claim were "obviously known" to counsel. He thus did not find sufficient grounds to grant leave to amend.

However, the motion judge's failure to apply the proper legal standard to determine whether plaintiff should have been permitted to amend her complaint is not an insurmountable impediment to this court. We start by turning to the first part of the test under Notte, "whether the non-moving party will be prejudiced." 185 N.J. at 501. Here, it is likely defendant would have been prejudiced by the amended complaint. The facts alleged in the original complaint do not give rise to a CEPA claim. The only allegation in the original complaint that could give rise to a CEPA claim is contained in one sentence:

14

"[p]laintiff further complained about employees stealing food in the Deli Department and eating during their shifts." This one sentence is embedded in the factual background plaintiff asserted as part of her sexual harassment claim. This oblique allusion does not adequately put defendants on notice that they would likely be required to defend a CEPA claim in the future. We are thus satisfied that the amended complaint would have been prejudicial to defendants.

Moreover, the attendant circumstances relating to the timing of the motion to amend were also prejudicial to defendants because they would have resulted in "undue delay." Tomaszewski, 240 N.J. Super. at 411. Plaintiff's original complaint was filed on April 25, 2016. Plaintiff's motion to amend was not filed until June 1, 2017, seven weeks from the discovery end date. When plaintiff filed this motion to amend, discovery was ongoing and defendants' litigation strategy was based on defending alleged violations of the LAD. Significant time and resources had already gone into the discovery process driven by the cause of action framed by plaintiff. To allow plaintiff to add a CEPA claim under these circumstances would have punished the diligent and rewarded the slothful. Sound judicial management cannot condone such an outcome.

We next address the second part of the Notte test, which requires the court to deny plaintiff's motion to amend a complaint if the proposed amendment

would be futile. 185 N.J. at 501. An amendment is futile when it cannot be sustained as a matter of law. Ibid. A plaintiff presents a prima facie CEPA claim when the following four elements are met: "(1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a 'whistle-blowing' activity described in N.J.S.A. 34:19-3c; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action." Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003).

Assuming all of the allegations in plaintiff's amended complaint are true, plaintiff did not establish a prima facie CEPA claim pursuant to N.J.S.A 34:19-3c(1) because her proposed amended pleading did not allege specific facts that show she suffered an adverse employment action as a proximate cause of engaging in whistleblowing activities. Paragraph 41 of plaintiff's proposed amended complaint states: "Defendants took retaliatory action against [p]laintiff by subjecting her to a hostile work environment, altering her duties and responsibilities, and/or by discharging her from employment." (Emphasis added). There is no factual allegations in the pleading to support this statement. Plaintiff resigned from her position at ShopRite. She was not terminated. In

16                                                                      A-3227-17T3

her LAD complaint she makes clear she was constructively discharged. Based on the foregoing, the motion to amend was properly denied because it was prejudicial and her CEPA cause of action was futile.

Finally, we address the court's decision to grant defendants' motion for summary judgment. Plaintiff argues the motion judge erred when he granted defendants' summary judgment motion because: (1) the complained of conduct was not gender neutral; (2) the conduct was severe and pervasive; and (3) viewing the facts in the light most favorable to plaintiff, including all reasonable inferences that can be drawn therefrom, a reasonable woman would have considered the conditions of employment to have been adversely altered. Defendants argue the judge properly applied the relevant standards to dismiss plaintiff's hostile work environment claim as a matter of law. We agree with defendants' position.

An appellate court reviews a grant of summary judgment by applying the same standard as the motion judge. Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016). Under that standard, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or

order as a matter of law." R. 4:46-2(c). All factual inferences are drawn in favor of the non-moving party. Ibid.

To survive defendants' summary judgment motion, plaintiff must show: (1) that she was harassed by her coworkers and supervisors; (2) this harassment would not have occurred but for her gender; (3) the harassment was so severe and/or pervasive that; (4) a reasonable woman would believe that; (5) the conditions of employment were altered and the work environment was hostile and/or abusive. Aguas v. State, 220 N.J. 494, 509 (2015); see also Lehman v. Toys 'R' Us, 132 N.J. 587, 603-04 (1993).

Under the first prong, "plaintiff must show by a preponderance of the evidence that the impermissible conduct would not have occurred but for plaintiff's protected status." Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 24 (2002). When a plaintiff alleges she has been subjected to sexual touching or comments, the first prong is automatically satisfied. Lehman, 132 N.J. at 605. However, if the alleged improper conduct is gender neutral, the first prong is not satisfied. Oakley v. Wianecki, 345 N.J. Super 194, 203 (App. Div. 2001). To create a jury question regarding the remaining prongs, the conduct at issue must be more than casual or sporadic. Shepherd, 174 N.J. at 25-26. It must go beyond "simple teasing, offhand comments, and isolated incidents."

Heitzman v. Monmouth County, 321 N.J. Super. 133, 147 (App. Div. 1999). We address prongs two through four under a reasonable woman standard. Lehman, 132 N.J. at 603-04.

Turning to the first and second prongs of the test in Aguas, plaintiff does not demonstrate that the complained of conduct constituted cognizable claims of gender bias or sexual harassment. Behavior that is unprofessional and offensive, while inappropriate, is significantly different than the discriminatory acts that the LAD makes actionable. See Oakley, 345 N.J. Super. at 203 (stating offensive conduct is not actionable under the LAD when it lacks the "connotation of inferiority" which accompanies discriminatory statements). Here, plaintiff specifically complained of three comments directed at her. The first one occurred when a fellow employee asked if she had just had sex before coming to work because her hair was messy. The second one involved an oblique reference to sexual activity made when plaintiff returned with dirty hands after discarding food in the compost bin. A coworker allegedly commented that plaintiff "likes it dirty."

The only other conduct directed at plaintiff was allegedly made by a male coworker when he said her accent was sexy. While these comments may be inappropriate, unprofessional, and boorish, especially in the workplace, they are

19

not inherently discriminatory statements about plaintiff's gender. They do not imply a "connotation of inferiority" based on her gender necessary to be actionable under the LAD.

Moreover, even assuming these comments satisfy the first and second prongs of Aguas, the record shows plaintiff did not produce sufficient evidence to establish a severe and pervasive gender bias to create a hostile a work environment. The conduct complained of must be more than "casual or sporadic" and go beyond "simple teasing, offhand comments, and isolated incidents." Heitzman, 321 N.J. Super at 147.

Here, the incidents simply do not rise to the level of "severe and pervasive" under the third prong of Aguas. The record shows the conduct was offhanded and isolated. Plaintiff was employed by ShopRite for four and a half months. Over the course of this limited employment history she only identified three comments directed at her and four other offensive events, which allegedly occurred in the work environment and did not involve her. These seven incidents were not "severe or pervasive" enough to sustain a claim under the LAD. The motion judge correctly decided this issue as a matter of law.

The final step in assessing a hostile work environment claim requires the court to determine whether "a reasonable [member of the protected class would

 A-3227-17T3

have] believe[d] that . . . the conditions of employment [were] altered and the working environment [was] hostile or abusive."  Taylor v. Metzger, 152 N.J. 490, 498 (1998) (third alteration in original) (quoting Lehman, 132 N.J. at 603-04).  Based on the infrequency and non-discriminatory character of the complained of remarks, there is insufficient evidence to conclude a reasonable woman would have found the conditions of employment altered or the environment hostile or abusive.

Plaintiff did not satisfy any of the required elements of the Supreme Court's test to establish a hostile work environment.  The court correctly granted defendants' summary judgment motion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3227-17T3