**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4189-18

IN THE MATTER OF M.M.,
ANCORA PSYCHIATRIC
HOSPITAL, NEW JERSEY
DEPARTMENT OF HEALTH.

_____

Argued May 24, 2021 – Decided September 16, 2021

Before Judges Messano, Hoffman and Smith.

On appeal from the New Jersey Civil Service Commission, Docket No. 2015-2963.

Nathan M. Edelstein argued the cause for appellant M.M. (Szaferman, Lakind, Blumstein & Blader, PC, attorneys; Nathan M. Edelstein, on the briefs).

Caroline Gargione, Deputy Attorney General, argued the cause for respondent New Jersey Department of Health (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Caroline Gargione, Deputy Attorney General, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent New Jersey Civil Service Commission (Steven M. Gleeson, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

When the Assistant Commissioner of the Department of Human Services (DHS) determined M.M.'s claims of sexual harassment and discrimination by a male clinical psychiatrist on her team at Ancora Psychiatric Hospital (Ancora), in violation of the State Policy Prohibiting Discrimination in the Workplace, N.J.A.C. 4A:7-3.1 to -3.2 (Policy) were unsubstantiated, and the Civil Service Commission (CSC) denied her a hearing, M.M. appealed. We reversed and remanded for a contested hearing before the Office of Administrative Law (OAL). In re M.M., No. A-5949-12 (App. Div. May 12, 2015). This appeal follows that remand hearing.

I.

The Evidence before the Administrative Law Judge (ALJ)

M.M. is a clinical psychologist at Ancora, where she has worked since 1999, providing individual and group therapy to patients living in the hospital. From 2011 through 2012, M.M. was assigned as the psychologist in the Birch D ward, on the same team with F.S., the team's psychiatrist. J.U. was the administrator of psychological services at Ancora. According to M.M., F.S. was the team's leader and could override treatment plans even if everyone else disagreed with him. M.M. testified both F.S. and J.U. were her "supervisors," a

characterization F.S. and J.U. disputed in their testimony. M.M. admitted that F.S. did not sign her performance evaluations, approve her time-off requests, nor assign her work duties. The ALJ found that F.S. was not M.M.'s supervisor, but J.U. was.

In August 2011, M.M. began to complain to J.U. about F.S.'s behavior. These complaints were documented in numerous emails introduced in evidence at the hearing. Predominantly, the complaints dealt with F.S.'s "demeaning" attitude toward M.M., and, on occasion, other female staff. M.M. objected to the manner in which F.S. spoke to her in front of patients, and she alleged F.S. was "developing a pattern of modeling for patients that female staff should not be respected." M.M. also complained about the medical decisions F.S. made regarding patient care and claimed he had been shutting her out of team meetings.

In November 2011, after F.S.'s return from a temporary assignment elsewhere in Ancora, M.M. complained about his "continued . . . behavior of excluding [her] from the team," and told J.U. that F.S. refused to let her speak during meetings. M.M. felt that his behavior was "illustrative of [his] refusal to accept the team model of treatment." She further alleged in a December 30, 2011 e-mail that she heard F.S. tell a nurse to assign male staff to a certain

3

patient. She claimed that F.S. praised a male nurse on the ward for being "alert and watching his patients all the time" adding, "women don't do that."

On January 13, 2012, M.M. told J.U. that F.S. had accused her of improperly filing a report of the use of excessive force by a staff member on a patient. She said this was motivated by F.S.'s anti-female bias. In another e-mail that same month, M.M. complained because F.S. attributed a patient's negative behavior to "late night interviews" with M.M. M.M. denied having any such meeting with the patient and said F.S. insinuated that "a female psychologist . . . meeting alone with male patients late at night" had "sexual overtones."

M.M. continued to e-mail J.U. with complaints about F.S.'s behavior throughout January and February 2012. In one message, she alleged that F.S. acted in a "flirtatious" manner with a female coworker who responded by joking and laughing with him; in another, she claimed he "[came] into places where [she] was to look at what [she] was doing," which M.M. characterized as "stalking." M.M. also testified that throughout her time working with him in Birch D ward, she saw F.S. touch female coworkers "inappropriately," make comments about their clothing, "make noises in reference to their sexual

desirability," shout at them, and "degrade them in front of male staff that they supervised."

M.M. testified that although she knew how to file a formal complaint with Ancora's EEO officer, she chose not to do so and, instead, "filed the complaints through [her] supervisor." However, she said J.U. did "nothing" about the e-mails she sent him between August 2011 and February 2012.

J.U. completed M.M.'s performance review (PAR) for the annual period ending in February 2012, after DHS' EEO officer received M.M.'s formal February 6, 2011 discrimination complaint. In the PAR, J.U. gave M.M. a failing grade for "organizational citizenship."[1] J.U. placed negative signs next to "willingly cooperates with others who hold different views in order to complete the task/job at hand," "understands his/her part in shaping the environment," and "treats fellow workers with respect," to indicate that these were areas he felt M.M. could improve. In the section of the PAR titled "specific areas identified for development," J.U. stated:

> At times, [M.M.] is abrasive in her communication style with her peers and other [Ancora] colleagues. This behavior usually takes the form of a communication style that does not allow for people to have a different view. In matters of correctness, when

---

[1] M.M. had never received an unfavorable evaluation in this or similar categories in prior PARs.

[M.M.] is correct, she needs to develop the skill of helping people "save face" when correcting them or offering an opposing view. Errors in a colleague's assessment of a situation (clinical or non-clinical) [are] often confronted abruptly or the merits of their thinking/position are entirely ignored. [M.M.] is encouraged to take responsibility for her role in shaping her current work environment.

In her "interim" PAR for the period March 2012 through February 2013, J.U. gave M.M. failing marks in both "organizational citizenship" and "teamwork." In the section labeled "specific areas identified for development," he wrote that M.M. needed to "work on negotiating patient treatment approaches that are acceptable to all team members." He also wrote that M.M. should "keep lines of communication open and help make 'room' for other team member views."

On March 16, 2012, J.U. told M.M. she would be transferred to another ward effective April 2, 2012, because of "operational efficiency needs." The transfer would not have affected M.M.'s title, pay, benefits, or job duties. M.M. protested because she felt leaving Birch D ward would upset her patients' treatment and thought it was unfair to move her instead of F.S. Ultimately, the transfer never occurred, and J.U. testified that this was because of advice from the legal staff. F.S. testified that he requested, and was granted, a transfer to a different ward to avoid further conflict with M.M.

A-4189-18

M.M. also claimed that J.U. retaliated against her by denying a leave request she submitted on March 28, 2012, to use vacation time on March 29 and 30, 2012. Although J.U. later testified that Ancora had an unwritten policy requiring employees to give two weeks' notice to request time off, M.M. said she was unaware of any such policy and had submitted late requests in the past without incident. She called another psychologist who testified that he thought employees could file leave requests up to one or two days before the requested leave. M.M. also submitted documentary evidence showing she and other employees had previously been approved for time off with less than two weeks' notice.

M.M. called other female Ancora employees as witnesses. M.C., a social worker who worked on a team with F.S. from 2007 to 2009, testified he demeaned her, harassed her with "explosive verbal attacks," "shut her down" when she tried to talk in meetings, and told other staff she "did not belong" at Ancora. A.I., another social worker on the same team with M.C., said F.S. was "nasty" to her, only showed respect to the men on the team, and made comments about other women in her presence. A.I. filed a complaint with Ancora's EEO officer alleging that F.S. said to her, "What do you know, you're a woman"; this

complaint was substantiated, and F.S. was transferred temporarily to another team.

However, both M.C. and A.I. testified that they never worked with M.M. and were not present for any of the incidents she alleged occurred between her and F.S. M.M. was not present during any of the incidents of which the other women complained but said F.S. spoke negatively about M.C. in her presence.

N.U., a registered nurse, was briefly part of the Birch D ward treatment team with M.M. and F.S. She testified that F.S. made comments that her clothing was "tight" and "sexy," and "looked at her cleavage." She complained to an assistant director of nurses at Ancora, and F.S. then began to blame N.U. for any trouble in their ward and yelled at her in front of patients. She transferred to another unit. N.U. did not witness any of the conduct M.M. alleged, nor was M.M. privy to any of the incidents of which N.U. complained.

D.K., a licensed practical nurse, was on the team F.S. was temporarily assigned to in October 2011. She said he was "nasty" and "degrading." On one occasion, after she asked F.S. to stop talking to another person near her station, he became offended and grabbed the front of her shirt to see her name tag. D.K. filed a complaint against F.S., but the EEO officer told her she should "drop" it because security cameras showed she hit F.S., as he had claimed. D.K. was

8

transferred to another unit. D.K. did not witness any of the incidents of which M.M. complained, and M.M. testified that she was aware of D.K.'s complaint only because F.S. spoke about it.

F.S. and J.U. both testified. F.S. denied most of the allegations, or otherwise explained his disagreements with M.M. regarding patient treatment and the assignment of male Ancora personnel to certain patients. He admitted to having expressed a negative view about M.M. meeting with patients at night, but said he did so out of concern for her safety and did not imply that she was doing anything inappropriate. F.S. claimed that he treated all staff the same way, and he testified about instances of M.M.'s insulting conduct toward him. F.S. acknowledged having a rocky relationship with M.C. and A.I. and admitted that as a result of A.I.'s substantiated complaint, he was sent to "sensitivity training."

J.U. testified that based on his training, whenever a complaint was submitted to him, he would consult Ancora's human resources office (HR) to "get guidance as to whether it would go to EEO for further research, [and] whether it warranted an investigation." It was "HR's responsibility" to give advice on what to do next. J.U. did not immediately refer M.M.'s emailed allegations to Ancora's EEO officer as sexual harassment complaints because,

he explained, she "did not word [her messages] that way" and didn't "use[] those legal terms." He testified that M.M. "would describe what happened and then [he] would consult with [HR] to see if it rose to that level." He believed that thereafter, HR "would do what they're supposed to do which is contact EEO" if they felt that was necessary. As noted, M.M.'s complaints were in fact referred to Ancora's EEO officer in February 2012.

J.U. explained his reasons for the ratings and comments on M.M.'s PAR evaluations. He based the comments on interviews with other staff, M.M.'s "self[-]reporting," and his personal observations of M.M. in the workplace. He explained that members of M.M.'s team told him she often refused to compromise or accept their ideas about patient treatment strategies if they conflicted with her own. He said M.M. was not a good team player and had contributed to a "hostile environment" within the team by "embarrassing" or "shaming" members who proposed ideas counter to hers to get them to agree with her.

J.U. testified that M.M. had "self[-]reported" to him that she had difficulty working with her team, and he acknowledged that her complaints to him about F.S. had influenced his decision to give her failing marks on the PARs. However, he explained that M.M.'s own actions were at least partly responsible

A-4189-18

for any negativity in her work environment and the resulting evaluations. J.U. said M.M.'s complaints were attempts to "shape her working environment," as stated in the PAR teamwork category, but, he explained, "shaping your work environment is more than just complaining," and should involve "developing lines of communication that are give-and-take and win-win type conclusions." J.U. would have preferred for M.M. to work out her differences with F.S. herself or seek help to "negotiate a win-win" and "facilitate some open discussion," instead of "managing up" by making a complaint and expecting F.S. to be punished. J.U. characterized any failing marks on the PARs as attempts to "[bring] focus to what [he] thought would help [M.M.] perform better in the team" rather than a "punishment." The decision to transfer M.M. was an attempt "to make the team work better" by swapping in a new psychologist who might be a better fit for the Birch D ward team.

Ancora also presented testimony from other employees. C.M.R., a social worker who worked with M.M. and F.S. from 2010 to 2012 in the Birch D ward, said discussions in the team became "combative" due to a "power struggle" between the two. She said most of the issues were caused by M.M., and that even after F.S. was transferred, M.M. continued to argue with the team's new psychiatrist. She said M.M.'s contributions to the team were undermined by her

11

A-4189-18

"snide tone," and rather than talk out her concerns about treatment strategies with the rest of the team, M.M. would write "dissenting notes" on the charts.

C.M.R. never heard F.S. say anything derogatory or sexist toward women or touch any woman inappropriately, and said he never attempted to silence M.M. during meetings. She did not recall "ever feeling offended by" F.S., who she felt simply got "frustrated" with M.M.'s behavior. C.M.R. testified that she eventually asked for a transfer because she did not enjoy "coming to team [meetings] every day and constantly being on the defensive" because of M.M.

H.N. also worked on the Birch D ward with M.M. and F.S. She testified that the two did not get along and often disagreed about patient care. H.N. "didn't have any problems with" F.S. and felt that M.M. was more to blame for the issues in the team. She also said M.M. had conflicts with F.S.'s replacement on the team, causing continued "tension" in the Birch D ward. H.N. never saw F.S. touch M.M. or any other co-worker, nor say anything sexist or inappropriate about women generally or female co-workers specifically.

P.B., a licensed practical nurse in the Birch D ward, also denied ever hearing F.S. say anything derogatory to or about M.M. or other women and said he did not prevent M.M. from speaking during meetings. J.H., a nurse practitioner in the Birch D ward, said she was interviewed by an EEO

12

investigator because M.M. falsely claimed to have witnessed F.S. touch J.H.'s breast. J.H. denied that F.S. ever touched her inappropriately.

The ALJ's Decision

In her initial decision, after discussing each witness's testimony, the ALJ made credibility findings based on her "opportunity to carefully observe the demeanor of the witnesses." She found M.M.'s testimony about F.S.'s conduct was not credible, while F.S.'s testimony was credible and was "corroborated by the majority of the witnesses who had first-hand knowledge of the facts and circumstances." Specifically, the ALJ also found J.U.'s testimony credible.

The ALJ stated that while the testimony of M.M.'s coworkers and team members was credible, it "did not corroborate [M.M.'s] allegations of sexual harassment, hostile work environment, a violation of [the Policy] or retaliation." M.M.'s witnesses, who "had their own issues with" F.S., "had no firsthand knowledge of any of the inappropriate conduct at issue in this case." The ALJ noted that three of the witnesses M.M. called "either didn't know or had no interaction with" M.M. until after this litigation began.[2] Because of these witnesses' lack of knowledge of the misconduct M.M. alleged, and M.M.'s lack

---

[2]  The ALJ did not specify which witnesses she was referring to by name. However, based the testimony, these witnesses were M.C., A.I., and D.K., who were not on the Birch D ward team during the relevant time period.

of knowledge of the witnesses' allegations about F.S., the ALJ found their testimony was "not relevant to [appellant's] claim[s] of hostile work environment or sexual discrimination."

The ALJ found that during the time they worked together, M.M. and F.S. "did not get along and were constantly in disagreement on the appropriate treatment" for patients in the Birch D ward. She found that M.M. was "openly hostile" to F.S., "which was observed and noted by several of the team members." The ALJ found that M.M.'s claims of sexual harassment and other inappropriate conduct by F.S. "were not witnessed or corroborated by any other members of the team or employees on the unit."

The ALJ found that Ancora "acted appropriately and timely in responding to multiple complaints" filed by M.M. She further found that the denial of M.M.'s time off request in March 2012 was based on "the untimeliness of the submission," and that in any event, M.M. took the time off and suffered no negative consequences. The ALJ found that the testimony of M.M.'s coworkers corroborated the failing marks she received on her PARs, "all of which related to her problems getting along with others." The ALJ concluded that the evaluations "were accurate and were not in retaliation" for the filing of an EEO

complaint against F.S. The ALJ further found that the attempt to transfer M.M. to another ward was "based on legitimate business purposes."

When rendering her legal conclusions, the ALJ first addressed claims that F.S. sexually harassed M.M. and that Ancora violated the Policy by not responding properly to her complaints. She found that M.M. failed to demonstrate that she was treated less favorably than other similarly situated workers. Other members of the treatment team "testified credibly" that F.S. "did not treat women any differently." Instead, the ALJ said any difference in his treatment of M.M. was "a direct result of [her] hostility and constant disagreement with [him] and everyone on the team."

Next, the ALJ addressed M.M.'s hostile work environment claim. She stated that to prevail, appellant needed to satisfy the four-prong test set forth in Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 603–04 (1993). The ALJ found that M.M. did not demonstrate that F.S.'s alleged conduct would not have occurred but for her gender. Although "the majority" of the specific incidents M.M. testified about occurred during team meetings, none of the other team members confirmed her allegations. "[A]ll [team members] disputed that [F.S.] treated women differently." The ALJ discounted the testimony of the other workers called by M.M. about F.S.'s behavior, finding that the incidents these witnesses

alleged, could not have had an impact on M.M. and that their testimony was therefore "irrelevant to [M.M.'s] claim of a hostile work environment."

Finally, the ALJ addressed M.M.'s retaliation claim. She found that M.M.'s vacation time request was denied "because it was untimely," that the denial was "predicated on a legitimate organizational need," and that M.M. suffered no adverse consequence when she failed to come to work. The ALJ further found that the attempt to transfer M.M. to a different ward was a good faith effort to "diffuse the difficult situation" between her and F.S. She found this "legitimate business reason" was further evidenced by the fact that after M.M. refused to be moved, Ancora moved F.S. instead. The ALJ stated this action supported a finding that Ancora responded appropriately to M.M.'s complaints by "[doing] everything they could to remedy the personality conflict" between the two employees. The ALJ concluded Ancora had not taken retaliatory action against M.M. in violation of the Policy.

The ALJ also concluded failing marks on M.M.'s PAR evaluations were not retaliatory conduct. She pointed to the testimony of J.U. and other coworkers that M.M. was "very difficult to work with and had caused hostility on the team." Any negative evaluations were "justified and had nothing to do with the fact that [M.M.] had filed an EEO complaint." The ALJ found that

16

M.M. "failed to submit any evidence that there [was] a causal link between the protected activity and the adverse PARs."

Ultimately, the ALJ concluded that M.M. did not "demonstrate by a preponderance of the credible evidence any violations of the [Policy] . . . , any sexual harassment or [any] hostile work environment," and did not demonstrate "there was any retaliation by the [employer] as a result of [her] filing of an EEO or any other complaints."

Following the filing of exceptions by M.M., on April 24, 2019, the CSC adopted the ALJ's findings of fact and conclusions of law without additional elaboration.

## II.

M.M. argues that the CSC's decision was arbitrary and capricious because it adopted and affirmed an ALJ's initial decision fraught with error. M.M. contends the ALJ wrongly: 1) failed to consider documentary evidence and three days' worth of witness' testimony; 2) found that testimony by other female Ancora employees who also alleged harassment by the same psychiatrist was irrelevant; 3) applied a "severe and pervasive" standard of proof when addressing M.M.'s hostile work environment claim, "ignoring" DHS's "Zero Tolerance Policy"; 4) found that J.U. handled her complaints in a timely fashion

17

as required by the Policy; and 5) concluded that J.U. did not retaliate against M.M.

Before addressing M.M.'s specific claims of error, we set some guideposts for our review. As with all agency determinations, our review is limited. In re Stallworth, 208 N.J. 182, 194 (2011) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579 (1980)). "A 'strong presumption of reasonableness attaches' to the Commission's decision." In re Tukes, 449 N.J. Super. 143, 156 (App. Div. 2017) (quoting In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001)). M.M. has "the burden to demonstrate grounds for reversal." Ibid. (citing McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 563 (App. Div. 2002)).

"In order to reverse an agency's judgment, an appellate court must find the agency's decision to be 'arbitrary, capricious, or unreasonable, or [ ] not supported by substantial credible evidence in the record as a whole.'" Stallworth, 208 N.J. at 194 (alteration in original) (quoting Henry, 81 N.J. at 579–80). We limit our consideration to

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

> [In re Carter, 191 N.J. 474, 482–83 (2007) (quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)).]

"A reviewing court 'may not substitute its own judgment for the agency's, even though the court might have reached a different result.'" Stallworth, 208 N.J. at 194 (quoting Carter, 191 N.J. at 483). "We are not, however, in any way 'bound by the agency's interpretation of a statute or its determination of a strictly legal issue.'" Cap. Health Sys., Inc. v. N.J. Dep't of Banking & Ins., 445 N.J. Super. 522, 536 (App. Div. 2016) (quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973)).

"Generally, it is not for a reviewing court or an agency head to reject a determination based on credibility when it was the ALJ who heard the testimony and was in the proper position to judge credibility." W.T. v. Div. of Med. Assistance & Health Servs., 391 N.J. Super. 25, 44 (App. Div. 2007) (citing Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587 (1988)); see also N.J.S.A. 52:14B-10(c) ("The agency head may not reject or modify any findings of fact [by the ALJ] as to issues of credibility of lay witness testimony unless . . . the findings are arbitrary, capricious or unreasonable or are not supported by sufficient, competent, and credible evidence in the record.").

The Policy, specifically, N.J.A.C. 4A:7-3.1(a), provides that "[t]he State of New Jersey is committed to providing every State employee . . . with a work

19

environment free from prohibited discrimination or harassment." It prohibits "employment discrimination or harassment" against state employees based on race, gender, religion, sexual orientation, and several other protected categories. Ibid. The Policy prohibits employment practices or procedures, such as hiring, promotion, discipline, and other actions, that treat an individual less favorably because she is a member of a protected category. N.J.A.C. 4A:7-3.1(a)(3).

The Policy also forbids using "derogatory or demeaning references" about members of protected categories in the workplace, "[t]reating an individual differently" based on their membership in a category, and "[e]ngaging in threatening, intimidating, or hostile acts toward another individual in the workplace because that individual belongs to, or is associated with," a protected category. N.J.A.C. 4A:7-3.1(b).

The Policy explicitly states that "sexual (or gender-based) harassment of any kind, including hostile work environment harassment, quid pro quo harassment, [and] same-sex harassment" are forbidden. N.J.A.C. 4A:7-3.1(c). "Sexual harassment" includes not only behavior that is explicitly sexual or suggestive in nature, but also "[g]eneralized gender-based remarks and comments" and "[u]nwanted physical contact." N.J.A.C. 4A:7-3.1(c)(2). In any case involving the Policy, "[t]he burden is on the complainant to articulate a

sufficient nexus between the alleged conduct to a protected category . . . ." N.J.A.C. 4A:7-3.1(i).

Specifically considering the Policy in another context, we recognized that we do not apply "[a] plenary standard of review . . . to an agency's interpretation of regulations that fall within a legislative scheme the agency is charged with implementing and enforcing. We are required to defer to such agency interpretations if they are reasonable." In re Hearn, 417 N.J. Super. 289, 298 (App. Div. 2010) (citations omitted). "A State agency's interpretation of its own regulations is presumed to be valid." Id. at 299 (citing In re Chief Clerk, 282 N.J. Super. 530, 536–37 (App. Div. 1995)). "An appellate court must abide by that rule of deference unless the agency's interpretation is plainly unreasonable." Ibid. (quoting In re Election Law Enf't Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 260 (2010)).

Having considered M.M.'s arguments in light of the record and the applicable standards governing our review, we affirm.

III.

A.

M.M. first asserts that the ALJ "lost, or otherwise inexplicably missed" three days' worth of crucial testimony and ignored "documentary evidence,"

specifically her numerous emails to J.U. She further notes the ALJ's written decision mislabeled some of her witnesses as "State" witnesses and misnamed another witness whose testimony the ALJ credited. M.M. also notes that the initial decision twice references some witnesses' testimony.

We acknowledge the sloppy draftsmanship of the initial decision, and we have no explanation for why witnesses were misnamed or their testimony twice cited. However, the initial decision specifically addresses the testimony of F.S. and J.U., which occurred on the days M.M. claims the ALJ "lost" or failed to consider. The ALJ did not ignore the documentary evidence; the initial decision summarizes the contents of some of M.M.'s emails. None of the cited errors in the text of the initial decision were "clearly capable of producing an unjust result," Rule 2:10-2, and the argument deserves no further discussion in a written opinion. R. 2:11-3(e)(1)(E).

B.

M.M. contends the ALJ erroneously concluded the testimony of fellow female Ancora workers about F.S.'s conduct was "irrelevant." She asserts that this testimony was relevant to show Ancora was "on notice" of F.S.'s misconduct towards women but tolerated it, relevant to challenge his credibility, and also

relevant to demonstrate that Ancora afforded F.S. an "opportunity" to harass women.

The State objected to the admission of the testimony in question, arguing that because M.M. had not witnessed any of the incidents the witnesses alleged, and the witnesses had not been privy to F.S.'s alleged behavior toward M.M., their testimony was irrelevant to any hostile work environment claim. However, during a conference call with the attorneys, the ALJ overruled the objection, finding that the testimony could not be introduced to prove F.S.'s "propensity," but could be admitted "to establish directly one or more of the essential elements of [M.M.'s] prima facie case" of sexual harassment or hostile work environment. The ALJ stated that if, when she reviewed appellant's testimony to formulate her decision, she confirmed that appellant "did not say she was aware of any of these other [women's incidents]," she would find that the women's testimony was "completely irrelevant" and would not give it "any weight whatsoever." She said the incidents could not have impacted M.M. if she "didn't know about them."

The Policy provides that state employees may file complaints regarding "third[-]party harassment." This term is defined as "unwelcome behavior involving any of the protected categories . . . that is not directed at an individual

but exists in the workplace and interferes with an individual's ability to do his or her job." N.J.A.C. 4A:7-3.1(a)(2). In Lehmann, the Court held that when an employee brings a hostile work environment-based sexual harassment claim under the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, she "may use evidence that other women in the workplace were sexually harassed" to support that claim. 132 N.J. at 610. The Court found that "[a] woman's perception that her work environment is hostile to women will obviously be reinforced if she witnesses the harassment of other female workers." Id. at 611. As a result, "[e]vidence of sexual harassment directed at other women is relevant to both the character of the work environment and its effects on the complainant." Ibid.; see also Rendine v. Pantzer, 141 N.J. 292, 309 (1995) (such evidence is generally "admissible to prove the employer's motive or intent to discriminate").

The ALJ did not exclude the evidence from M.M.'s three witnesses, and it was clearly "relevant." See N.J.R.E. 401 (evidence is relevant if it tends "to prove or disprove any fact of consequence to the determination of the action"). However, as Judge King noted in writing for our court:

> Relevancy is composed of two parts: materiality and probative value. "Materiality looks to the relation between the propositions for which the evidence is offered and the issues in the case." "Probative value"

A-4189-18

is "the tendency of evidence to establish the proposition that it is offered to prove." . . . A determination of relevancy lies in "the judge's own experience, his general knowledge, and his understanding of human conduct and motivation."

[Muise v. GPU, Inc., 371 N.J. Super. 13, 60 (App. Div. 2004) (first citing McCormick on Evidence (Cleary ed., 3d ed. 1984); and then quoting State v. Allison, 208 N.J. Super. 9, 17 (App. Div. 1985)).]

Having determined that M.M. was not a credible witness, particularly regarding her own allegations of F.S.'s sexually discriminating and harassing conduct, the ALJ's conclusion that the testimony of these three witnesses was "irrelevant" is nothing more than her determination, as the factfinder, that the evidence lacked probative value and did not tend to prove any "fact of consequence." Nor did this evidence tend to prove "third[-]party harassment" under the Policy, which required proof that the complained-of conduct directed toward others "interfere[d] with [M.M.'s] ability to do . . . her job." N.J.A.C. 4A:7-3.1(a)(2). M.M. admittedly never witnessed any of F.S.'s alleged conduct directed toward these other witnesses.

C.

M.M. contends the ALJ applied the wrong standard in assessing the evidence of a hostile work environment because she applied a "severe and pervasive" standard of proof instead of the "zero tolerance" or "strict liability"

standard M.M. contends the Policy established for discrimination complaints raised by State employees. N.J.A.C. 4A:7-3.1(a) states that all types of misconduct outlined in the Policy are "strictly prohibit[ed]," and further explains:

> This is a zero[-]tolerance policy. This means that the State and its agencies reserve the right to take either disciplinary action, if appropriate, or other corrective action, to address any unacceptable conduct that violates this policy, regardless of whether the conduct satisfies the legal definition of discrimination or harassment.

In Lehmann, the Court set forth the test for determining whether a plaintiff has established a claim of hostile work environment sexual harassment. Under this test, the plaintiff must "allege[] discriminatory conduct that a reasonable person of the same sex in the plaintiff's position would consider sufficiently severe or pervasive to alter the conditions of employment and to create an intimidating, hostile, or offensive working environment." 132 N.J. at 592 (emphasis added). The Court explained that ultimately, what is required is "a showing that it is more likely than not that the harassment occurred because of the plaintiff's sex." Id. at 605.

Lehmann addressed hostile work environment claims in the context of the LAD, which concerns workplace discrimination generally. The Policy states

that action may be taken to remedy discriminatory conduct visited on State employees even where that conduct does not meet this "legal definition." N.J.A.C. 4A:7-3.1(a).

The ALJ clearly understood she was adjudicating M.M.'s claims under the Policy, not the LAD. She quoted extensively from the Policy's language regarding each aspect of M.M.'s allegations. However, to the extent she believed M.M. needed to prove a "severe or pervasive" alteration of workplace conditions to prove a violation of the Policy, the ALJ was wrong.

Nevertheless, based on her credibility determinations, the ALJ ultimately found that M.M.'s complaints were not believable, and that she failed to establish disparate treatment or hostility in the workplace based on her membership in a protected category. Such proof was a sine qua non of any violation of the Policy. Indeed, as previously noted, the Policy places the burden on the complainant to demonstrate "a sufficient nexus" between the complained-of conduct and a protected category. N.J.A.C. 4A:7-3.1(i). Having made these factual determinations, the ALJ's recitation of the wrong standard was harmless because the very same factual findings supported the ALJ's conclusion that M.M. failed to prove a violation of the Policy.

D.

M.M. asserts the ALJ "disregard[ed]" evidence that J.U. failed to immediately report her complaints about F.S. to Ancora's EEO officer. She contends this is a "per se" violation of the policy. We disagree.

The Policy states that "[s]upervisors shall make every effort to maintain a work environment that is free from . . . prohibited discrimination/harassment." N.J.A.C. 4A:7-3.1(e). Accordingly, "[s]upervisors shall immediately refer allegations of prohibited discrimination/harassment" to their agency's EEO or affirmative action (AA) officer, or any other individual designated by the agency to receive such complaints. Ibid. Failure to comply with this requirement "may result in administrative and/or disciplinary action, up to and including termination of employment." Ibid. The State's Model Procedures for Processing Internal Complaints Alleging Discrimination in the Workplace also requires supervisors to "immediately report all alleged violations" of the Policy to an EEO/AA officer. N.J.A.C. 4A:7-3.2(d).

The ALJ concluded that "[w]hen [M.M.] made complaints about [F.S.], [J.U.] referred the matters to human resources and the EEO office." This finding is supported by J.U.'s testimony that he informed Ancora's HR department of M.M's emailed allegations as he received them. He awaited HR's review and

investigation to receive guidance as to whether the complaints should be referred to the EEO officer. J.U. also explained that he did not direct the complaints immediately to the EEO officer because he viewed them as worded to be complaints about F.S.'s rude conduct and not complaints that fell under the Policy. Indeed, most, but not all, of the emails support J.U.'s evaluation.

Even if J.U. failed to refer some of the emails that more clearly alleged F.S.'s conduct was directed toward M.M. because she was female, the Policy only provides for disciplinary action against the supervisor who fails to adhere to its reporting requirements. There is no per se violation of the Policy, as M.M. alleges, simply because the employee's supervisor failed to assess the nature of his subordinate's complaints about harassment or discrimination in the workplace. This is particularly true since the ALJ did not believe M.M.'s allegations.

E.

M.M. argues that J.U. admitted he gave her a failing mark on her PARs because of her complaints about F.S. She asserts, therefore, that the evidence indisputably demonstrated Ancora retaliated against her in violation of the Policy. It is true that N.J.A.C. 4A:7-3.1(h) prohibits "[r]etaliation against any employee who alleges that she . . . was the victim of discrimination/harassment,"

A-4189-18

and employees who bring Policy-based complaints "shall [not] be subjected to adverse employment consequences." The Policy gives examples of such prohibited retaliatory actions including: termination, failure to promote, altering the complainant's work assignment for "other than legitimate business reasons," threatening or imposing disciplinary action for non-legitimate business reasons, and "ostracizing" the complainant. Ibid. The Policy does not address the burden of proof on a complainant, other than, as already noted, to "articulate a sufficient nexus between the alleged conduct to a protected category." N.J.A.C. 4A:7-3.1(i).

Here, the ALJ found that M.M. did not present "any evidence" of a causal link between her complaints about F.S. and the negative marks and comments on her PARs. That clearly is not entirely true, at least to the extent that J.U. acknowledged one of the sources of information he considered in completing the PAR evaluations was M.M.'s self-reporting, an obvious reference to her emails about F.S.

We analogize the elements of a retaliation claim brought under the Policy to those brought under the LAD. Under the statute, "the elements of the cause of action are that the employee 'engaged in a protected activity known to the [employer,]' the employee was 'subjected to an adverse employment decision[,]'

and there is a causal link between the protected activity and the adverse employment action." Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 547 (2013) (alterations in original) (quoting Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 274 (App. Div. 1996)).  If a plaintiff presents a prima facie case of retaliation, the burden shifts to the defendant to "articulate a legitimate, non-retaliatory reason for the decision."  Young v. Hobart W. Grp., 385 N.J. Super. 448, 465 (App. Div. 2005) (quoting Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 549 (App. Div. 1995)).  Then, the plaintiff must demonstrate that the employer had a discriminatory motive, and its proffered reason was simply pretextual.  Romano, 284 N.J. Super. at 549.

Assuming arguendo M.M. established a prima facie nexus between her complaints and the negative PAR evaluations, there is sufficient credible evidence in the record to support the ALJ's finding that Ancora demonstrated a non-pretextual reason supporting the legitimacy of the evaluations.  J.U. testified that he interviewed other Birch D ward team members and learned that they felt M.M. was "abrasive" and difficult to work with.  The testimony Ancora adduced from other team members corroborated this assessment of M.M.'s negative communication style and responsibility for "tension" within the team separate from her conflicts with F.S.  The ALJ concluded that Ancora's decision

to transfer F.S. was evidence that the negative evaluation was not pretextual, and we note that the other employees testified M.M. continued to have negative interactions with the psychiatrist that replaced F.S. on the team.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4189-18